IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Application of Storag Etzel GmbH for an Order, Pursuant to 28 U.S.C. § 1782, to Obtain Discovery for Use in a Foreign Proceeding | Case No.<br><br>**CONFIDENTIAL**<br>**FILED UNDER SEAL** |

**DECLARATION IN SUPPORT OF THE APPLICATION**

Pursuant to 28 U.S.C. § 1746, I, Dr. Daniel Schnabl, declare:

1. I am a partner of the international law firm Freshfields Bruckhaus Deringer LLP ("Freshfields"). I am an attorney qualified in Germany (Rechtsanwalt), and I am admitted to the Bar in Frankfurt am Main in good standing. I also hold a Master of Laws Degree from the University of Miami.

2. I am lead counsel to Storag Etzel GmbH ("Storag") in pending arbitration proceedings against Baker Hughes (Deutschland) GmbH in Germany ("Baker Hughes Germany").

3. I submit this Declaration in support of Storag's application for discovery from the Baker Hughes, a GE Company, LLC, pursuant to 28 U.S.C. § 1782 ("Section 1782"), for use in a foreign proceeding (the "Application").

**The Parties**

4. Storag is the Applicant for Section 1782 discovery and the Claimant in the foreign proceeding. Storag is in the business of developing, operating, maintaining, and marketing

1

underground gas storage caverns for the storage of large volumes of natural gas under high pressure. These caverns are man-made spaces in the layer of salt approximately 1,000 meters below surface level in Etzel, Germany, and each is approximately the size of the Empire State building.

5.  Respondent in this Application is Baker Hughes, a GE Company, LLC, a limited liability company organized under the laws of Delaware.

6.  Baker Hughes (Deutschland) GmbH is the named respondent in the arbitration proceeding pending in Germany and is a wholly-owned subsidiary of Baker Hughes.

### The Confidential Foreign Proceeding

7.  Storag's Application for Section 1782 discovery is in aid of a foreign proceeding (the "Arbitration") governed by the Rules of the German Arbitration Institute (the "DIS Rules").[1] The DIS Rules require that the Arbitration must be kept confidential. Specifically, Article 44.1 of the DIS Rules provides that:

> Unless the parties agree otherwise, the parties and their outside counsel, the arbitrators, the DIS employees, and any other persons associated with the DIS who are involved in the arbitration shall not disclose to anyone any information concerning the arbitration, including in particular the existence of the arbitration, the names of the parties, the nature of the claims, the names of any witnesses or experts, any procedural orders or awards, and any evidence that is not publicly available.

8.  A true and correct copy of the DIS Rules is attached hereto as Exhibit A (English original).

9.  On March 11, 2019, Storag commenced the Arbitration against Baker Hughes Germany by filing a statement of claim pursuant to the DIS Rules. I signed this statement of

---

[1] DIS is the acronym for the German Arbitration Institute in its native German, "Deutsche Institution für Schiedsgerichtsbarkeit."

claim and submitted it to the DIS on March 11, 2019. On March 12, 2019, the DIS confirmed its receipt of the statement of claim and assigned the proceedings the reference number "DIS-SV-2019-00183."

10. A true and correct copy of the March 12, 2019 letter from the DIS is attached hereto as Exhibit B (English translation and German original).

11. On June 12, 2019, Baker Hughes Germany filed its statement of defense in the Arbitration. To-date, there have not been any rulings on discovery in the Arbitration.

### Summary Of The Underlying Facts

12. The facts underlying Storag's claims in the Arbitration relate to Baker Hughes Germany's supply of defective sub-surface safety valves ("SSSV") to Storag for use in 30 underground caverns, and an arbitration award declaring Baker Hughes Germany's liability for supplying the defective components (the "Award").

13. After the sudden rupture of two SSSVs in 2014, Storag brought the first arbitration underlying the Award against Baker Hughes Germany in June 2015 (the "First Arbitration"). In June 2018, after hearing from several technical experts, the arbitral tribunal rendered its Award, which concluded that all SSSVs provided by Baker Hughes Germany suffer from the same serial defect: they are all made from a material called "AISI420mod,"[2] which is susceptible to intergranular corrosion when used in a welded application, as the SSSVs were used in the caverns.

14. A true and correct copy of the Award is attached hereto as Exhibit C (English translation and German original).

---

[2] AISI420mod is a type of 13 percent chrome steel, which is also referred to, *inter alia*, as "420mod SS," "420mod Stainless Steel," "X40CrMoVN16-2," "AISI 420," "420 SS," "420 Stainless Steel," and "X20Cr13."

15. The award reads, *inter alia*, in its English translation:

> The arbitral tribunal considers the presence of a serial defect on account of susceptibility to intergranular corrosion as a result of an incorrect selection of material (or – for this purpose – susceptibility to hydrogen-induced stress corrosion cracking as a result of an incorrect selection of material) to have been established. . . . In particular, the critical material AISI420mod was used in all the sets and was welded with the identical contacting material.

Ex. C, Award, ¶¶ 546, 548.

16. The arbitral tribunal further held that this serial defect caused the two ruptures that already occurred in the caverns:

> The arbitral tribunal considers the causality of the determined defect for the ruptures of the production string as established. . . . Then, in the judgment for the proof of causation, a "degree of certainty that silences doubts" suffices. Of ca. 100 weld seams per cavern in the two ruptures in Etzel (and the two ruptures in Epe) it was always only the heat affected zone of the only seam with the welded material AISI420mod that ruptured. The likelihood that this is repeated just in Etzel by pure coincidence, is calculated to be 1:10,000. This satisfies the degree of certainty required in civil proceedings.

*Id.* at ¶¶ 703, 705.

17. Based on these findings, the arbitral tribunal held Baker Hughes Germany liable and granted, *inter alia*, the following declaratory relief:

> In partial approval of Request 6 of the Plaintiff, it is declared that the Defendant must compensate the Plaintiff for all damages that are caused to it with respect to the completions in the caverns located in Etzel with the numbers K303 – K316, K319 – K324, K327 – K332, K334, K337, K338, K345 as well as Set 31 due to the lack of resistance to corrosion of the material AISI420mod in the subsurface equipment supplied by the Defendant. . . .

*Id.* at ¶ 921(6).

18. The defective SSSVs have so far only been removed from the two caverns that already ruptured; defective SSSVs are still in the other 28 caverns. Due to the serial defect

confirmed by the Award, Storag decided to repair the other 28 caverns and replace the defective SSSVs, but Baker Hughes Germany refuses to pay for these repairs. Thus, Storag brought a second arbitration—the Arbitration for which it seeks Section 1782 discovery—in order to quantify the repair costs.

### Storag's Need For Discovery From Baker Hughes In The United States

19. Baker Hughes designed, manufactured and supplied the defective SSSVs to Baker Hughes Germany to install in Storag's caverns.

20. In the Arbitration, Baker Hughes Germany raises several allegations that Storag believes would be contradicted by documents in the possession of its US parent company—Baker Hughes. Thus, Storag intends to use the documents it requests in its Application to rebut Baker Hughes Germany's allegations in the Arbitration.

21. In its statement of defense, Baker Hughes Germany alleges that a preliminary safety measure installed in the 28 non-ruptured caverns to prevent uncontrolled ruptures sufficiently addresses the defect, rendering proper repairs unnecessary. This preliminary safety measure involved placing a tube called a "Straddle" within the SSSVs to relieve some of the stress on the corroding AISI420mod material. However, in an internal email within the Baker Hughes group, the Straddles are discussed in the context of considering "temporary vs. final workover[s]." Therefore, Storag believes that Baker Hughes is in possession of documents that are relevant to the fact that the Straddles do not constitute a proper permanent fix contrary to Baker Hughes Germany's allegations in the Arbitration.

22. A true and correct copy of the email is attached as Exhibit D (English Original).

23. In its statement of defense, Baker Hughes Germany alleges that Storag's claims for losses arising from repairing the defective SSSVs are excessive. Storag currently claims a

5

total of EUR 142 million in the Arbitration, and it believes Baker Hughes has internal assessments of repair costs that could prove Storag's claims are reasonable and that Baker Hughes' actual assessment of the costs of a proper full repair is even higher. During the oral hearing in the First Arbitration, I personally cross-examined Mr. Anthony Free, Baker Hughes Germany's witness, and in response to my questions he testified that the costs caused by defective subsurface equipment can exceed EUR 1 billion. In his written witness statement, Mr. Free even wrote that with projects of this magnitude the delivery of even only one subsurface equipment alone can cause damages in the amount of more than a billion. Accordingly, Storag has reason to believe that Baker Hughes has done internal assessments of the financial consequences of such a defect, in particular repair costs, that contradict Baker Hughes Germany's allegations in the Arbitration that Storag's claim for EUR 142 million is excessively high.

24.   Baker Hughes Germany also challenges the recoverability of the costs claimed by Storag as a matter of German law. In particular, Baker Hughes Germany suggests that German law obliges Storag to take account of any "new for old" benefit that it would allegedly obtain from replacing the defective SSSVs. However, under German case law these arguments do not serve as a defense where there was knowledge of the defect. Thus, documents showing that Baker Hughes and/or Baker Hughes Germany knew that SSSVs comprised of welded AISI420mod would be susceptible to intergranular corrosion are relevant to Storag's claims in the Arbitration and would rebut Baker Hughes Germany's allegation that German case law on "new for old" benefits could apply. The same holds true under German case law for Baker Hughes Germany's allegation in the Arbitration that the repair costs were disproportionate to the value of the defective equipment as German courts have held that depending on the degree of

fault, a respondent may be precluded from arguing the costs to remedy this defect are disproportionate.

25. Accordingly, Storag believes Baker Hughes has documents and information relevant to its claims in the Arbitration. However, Storag expects that those documents and that information will be unattainable through the Arbitration's discovery procedures. During discovery in the First Arbitration between Storag and Baker Hughes Germany, Baker Hughes Germany expressly refused to provide documents located in the US on the grounds that those documents belonged to its US parent company Baker Hughes and were outside of Baker Hughes Germany's control. Storag believes that Baker Hughes Germany will again contend that documents and information highly relevant to Storag's claims in the Arbitration are outside of Baker Hughes Germany's control because they reside with Baker Hughes in the US.

26. Accordingly, Storag seeks, *inter alia*, the following categories of documents from Baker Hughes that are highly relevant to its claims in the Arbitration:

(a) Documents showing internal Baker Hughes assessments of the costs of fully repairing the caverns with defective SSSVs (in particular by removing and replacing the defective SSSVs);

(b) Documents showing internal Baker Hughes assessments of the technical effect of the Straddles (including their adverse effects on injecting and extracting gas), and whether a permanent solution would ultimately be necessary to remedy the defect in the SSSVs; and

(c) Documents showing that Baker Hughes and/or Baker Hughes Germany knew about the risk of intergranular corrosion, and why, despite this knowledge, they did not warn customers of the risk.

27. In addition, Storag seeks the deposition of a corporate representative appointed by Baker Hughes to testify on the above topics.

28. With the exception of documents and information concerning Baker Hughes' and/or Baker Hughes Germany's knowledge of the risk of intergranular corrosion, Storag's discovery requests are limited to the timeframe in which it started contracting with Baker Hughes Germany for the supply of the SSSVs, the ruptures, and the resulting dispute over remedying the defect—2008 through the present. Storag requests discovery concerning Baker Hughes' and/or Baker Hughes Germany's knowledge of the risk of intergranular corrosion from 2002 through the present because there is a Baker Hughes Material Specification for AISI420mod, dated September 17, 2002, that internally warns of risks associated with the material. This document states, "[t]he material shall be quickly heated and cooled through the temperature range of 570°F (300°C) to 1200°F (650°C). Prolonged exposure to this temperature range shall be strictly avoided." Ex. E, Material Specification, ¶ 4.2.3.

29. A true and correct copy of the Baker Hughes Material Specification is attached as Exhibit E (English Original).

30. Furthermore, in an internal email dated April 14, 2011, Paul Agosta, a Baker Hughes employee explains that sensitization and loss of corrosion resistance occurs when "13Cr" (AISI420mod is a type of 13Cr steel) has been exposed to "the temperature range of 400 - 600°C"—temperatures that occur during the welding process—and attaches a graph depicting this phenomenon.

31. A true and correct copy of the email is attached as Exhibit F (English Original).

## The Arbitration Tribunal Will Lack The Power To Order Discovery From Baker Hughes

32. Given Baker Hughes Germany's refusal to produce documents held by Baker Hughes in the First Arbitration, Storag expects that Baker Hughes Germany will again refuse to voluntarily provide the documents and information that Storag's Application seeks. Further, Storag will not be able to obtain documents directly from Baker Hughes in the Arbitration because Baker Hughes is a non-party to the arbitration. Article 28.2 of the DIS Rules provides that "the arbitral tribunal may . . . order any *party* to produce or make available any documents or electronically stored data." Ex. A, DIS Rules, Art. 28.1 (emphasis added). However, the DIS Rules do not provide for document requests to be issued directly against non-parties, such as Baker Hughes. Baker Hughes Germany refused the discovery of documents from Baker Hughes in the First Arbitration arguing, *inter alia*, that there is no legal basis to ask for discovery from non-party Baker Hughes.

33. The discovery sought from this Court through this Application is not prohibited by either the DIS Rules or German statutory procedural law. There is consequently no law, rule of evidence, or rule of procedure in German proceedings that prohibits Storag from filing the Application or from seeking and obtaining the discovery requested and using it in the Arbitration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed August 26, 2019, in Frankfurt a. M., Germany

By: _____
Dr. Daniel Schnabl

9