# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>Application of Storag Etzel GmbH for an Order, Pursuant to 28 U.S.C. § 1782, to Obtain Discovery for Use in a Foreign Proceeding | Misc. C.A. No. 19-mc-209-CFC |

## REPORT AND RECOMMENDATION

Rodney A. Smolla, Special Master

The District Court assigned this matter to the Special Master in a Memorandum Order entered on January 23, 2020. (D.I. 40). The Special Master was appointed to address a pending unopposed motion for leave to file a Sur-Reply Brief under seal (D.I. 38), to address the propriety of redactions in various submissions filed by both parties under prior similar unopposed motions to file under seal (D.I. 22, 23, 24, 36, and 37), and to address any future filings submitted by either party accompanied by motions to file under seal.[1]

_____

[1] The submissions of Storag and Baker Hughes on the issues assigned to the Special Master were submitted under seal, to preserve the confidentiality of material claimed to be justifiably sealed while those secrecy claims were themselves being litigated. For the same reason, this Report and Recommendation has also been initially filed

The District Court's order broadly instructed the Special Master to determine whether the redacted filings comply with the legal principles that govern the sealing of documents filed in federal judicial proceedings as established by the Supreme Court of the United States and the United States Court of Appeals for the Third Circuit. Memorandum Order (D.I. 40, at 4).

## I. Background

This proceeding was brought by the Applicant Storag Etzel GmbH pursuant to 28 U.S.C. § 1782, seeking to obtain discovery from Baker Hughes, a GE Company, LLC. Section 1782 is a federal statute empowering federal district courts to order discovery for use in foreign proceedings, granting district courts the discretion to order "testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal." *Id*. § 1782(a).

Storag is in the business of developing, operating, maintaining, and marketing underground gas storage caverns for the storage of natural gas. Baker Hughes, a Delaware limited liability company, provided equipment to Storag to be used in the operation of Storag's natural gas storage facilities. Storag claimed the equipment was defective. This led to two successive arbitration actions in Germany, conducted

---

under seal, pending review. To the extent that the recommendations for unsealing are adopted and affirmed, the submissions to the Special Master and this Report and Recommendation should also be unsealed.

under the auspices of the German Arbitration Institute, the English-language translation for "Deutsche Institution für Schiedsgerichtsbarkeit," or "DIS."

The first German arbitration ended with an award of declaratory relief for Storag against Baker Hughes, to compensate Storag for all damages arising from the allegedly defective equipment. Storag and Baker Hughes, however, subsequently disputed the obligations of Baker Hughes under the first German arbitration, leading to a second arbitration before DIS, pending at the time Storag filed its § 1782 application in this Court.

Storag asserts in its § 1782 application that discovery against Baker Hughes is warranted because Baker Hughes allegedly possesses documents and information highly relevant to the pending German arbitration proceedings. Baker Hughes vigorously contests the application for § 1782 relief, interposing various legal and factual arguments.

Among the legal issues central to the dispute regarding the appropriateness of providing Storag relief under § 1782 is the threshold question of whether a private foreign arbitral forum such as DIS qualifies as a "foreign or international tribunal" within the meaning of § 1782(a). There is some division among decisions nationwide as to whether such proceedings do or do not fall within the statutory term "foreign or international tribunal," particularly as interpreted by the Supreme Court's seminal decision applying § 1782, *Intel Corporation v. Advanced Micro Devices, Inc.*, 542

3

U.S. 241 (2004).  *Compare In re Application to Obtain Discovery for Use in Foreign Proceedings*, 939 F.3d 710, 726 (6th Cir. 2019) (A foreign commercial arbitration panel conducted by the Dubai International Financial Centre-London Court of International Arbitration was a "foreign or international tribunal" within the coverage of § 1782); *with Republic of Kazakhstan v. Biedermann International*, 168 F.3d 880, 883 (5th Cir. 1999) (Private international arbitrations do not fall within the compass of § 1782); *and National Broadcasting Co., Inc. v. Bear Stearns & Co., Inc.*, 165 F.3d 184 (2d Cir. 1999) (A commercial arbitration conducted in Mexico under the auspices of the International Chamber of Commerce, a private organization headquartered in France, was not a "proceeding in a foreign or international tribunal" within the meaning of § 1782).

Within this United States District Court, Judge Richard G. Andrews issued a recent decision noting the split of authority and holding that a private arbitral tribunal does not qualify. *In re Application of Ewe Gasspeicher GmbH*, No. CV 19-MC-109-RGA, 2020 WL 1272612, at *2 (D. Del. Mar. 17, 2020) ("While there are reasonable arguments on both sides of the debate, I hold that a private commercial arbitration is not a 'tribunal' within the meaning of § 1782.").

Storag and Baker Hughes have submitted extensive briefing and supporting declarations and exhibits to the District Court advancing their conflicting positions on the merits of Storag's § 1782 application.  From the initial commencement of the

4

Application of Storag, through the ultimate appointment of a Special Master by the District Court, both Storag and Baker Hughes have expansively sought to present their legal and factual submissions under seal.

The very first document filed on the docket in this matter, for example, was Applicant Storag's "Motion for Leave to File Under Seal," which was filed on August 29, 2019.  Subsequent substantive filings by both Storag and Baker Hughes have been similarly accompanied by motions that sought permission to submit the filings under seal.  Effectively, both Storag and Baker Hughes sought to conduct the pending § 1782 litigation largely out of public view.

This case was originally assigned to District Judge Andrews.  In Storag's initial Motion for Leave to File Under Seal, Storag asserted as its basis for sealing the confidentiality protocols set forth in the German DIS Rules.  Storag specifically relied on DIS Article 44.1, which provides:

> Unless the parties agree otherwise, the parties and their outside counsel, the arbitrators, the DIS employees, and any other persons associated with the DIS who are involved in the arbitration shall not disclose to anyone any information concerning the arbitration, including in particular the existence of the arbitration, the names of the parties, the nature of the claims, the names of any witnesses or experts, any procedural orders or awards, and any evidence that is not publicly available.

(D.I. 1, at 3), *quoting* 2018 DIS Arbitration Rules, Art. 44.1 (March 1, 2018), *available at*  http://www.disarb.org/upload/rules/2018-DIS-Arbitration-Rules.pdf.

Storag argued that it was "compelled . . . to maintain confidentiality over information that will necessarily be contained in the Application and associated documents." (D.I. 1, at 3). Storag thus sought leave to file its documents "under seal to ensure it maintains the confidentiality of the information protected by Article 44.1 of the DIS Rules to the extent reasonably possible." *Id.* To reinforce its submission, Storag noted that "[u]nder German law, potential consequences of proven breaches of such confidentiality obligations can include contractual or tortious damages claims, as well as fines for breaches of statutory obligations." *Id.* at n. 3.

Storag's initial motion to file under seal asserted that its submissions to the District Court do not in themselves breach the confidentiality conditions imposed by the German DIS arbitral rules, citing an exception that permits disclosure to a court or to the parties of a legal dispute to enforce a party's rights. *Id.* at n. 2. ("German law recognizes a general exception to any duty of confidentiality where a party has to disclose confidential information to pursue its legitimate interests, such as the disclosure of information to a court or to the parties of a legal dispute in order to enforce a party's rights."), *citing* KYRIAKI NOUSSIA, CONFIDENTIALITY IN INTERNATIONAL ARBITRATION: A COMPARATIVE ANALYSIS OF THE POSITION UNDER US, GERMAN, AND FRENCH LAW 67 (2010) ("Even if the parties are obligated to treat the information disclosed, in the arbitral proceedings, as confidential, further

exceptions, to the parties' duty of confidentiality, relate to the protection of the legitimate interests of the parties."). This meant, Storag asserted, that "the disclosure of information by Applicant to this Court does not constitute a breach of its confidentiality obligations." (D.I. 1, at 3, n.2).

On August 29, 2019, the same day that Storag filed its opening Motion for Leave to File Under Seal, Judge Andrews denied the Motion. In a brief notation, Judge Andrews wrote: "I do not think German arbitration rules provide good cause for sealed proceedings in U.S. Courts.  But that's the only reason offered."  (D.I. 7).

Shortly thereafter, the case was reassigned to District Judge Colm Connolly. Judge Connolly denied Storag's Motion for Reconsideration of its sealing request. (D.I. 11).   Following reassignment, the Court rejected Storag's application to proceed *ex parte*, and ordered that notice of the proceedings be provided to Baker Hughes.  Once Baker Hughes was brought in, and the matter proceeded with both parties litigating, the consistent practice of both Baker Hughes and Storag was to submit substantive filings accompanied by unopposed motions for leave to file under seal.  These included: a sealed Memorandum in Opposition filed by Baker Hughes (D.I 18, redacted version D.I. 22); a sealed Declaration, with Exhibits, in support of its Memorandum in Opposition, filed by Baker Hughes (D.I. 19, redacted version D.I 23); a sealed Declaration of Andrew Zeve, with Exhibits, filed by Baker Hughes (D.I. 20, redacted version D.I. 24); a sealed Reply Brief, filed by Storag (D.I. 33,

redacted version D.I. 36); a sealed Declaration in Support of the Application, filed by Storag (D.I. 34, redacted version D.I. 37); and a sealed Sur-Reply Brief, filed by Baker Hughes (D.I. 39, redacted version D.I. 41).

In submitting their various unopposed motions for leave to file their submissions under seal, both Storag and Baker Hughes continued to rely heavily upon the confidentiality rules that govern German DIS arbitration proceedings.  For example, in the unopposed motion filed by Baker Hughes for leave to file its Sur-Reply under seal (D.I. 38), Baker Hughes argued that "good cause" existed to seal its submission, given the "strict confidentiality and broad restrictions governing the Underlying Proceedings" being conducted in Germany.  (D.I. 38, at 3).  In advancing its unopposed motion to file its Sur-Reply under seal, Baker Hughes recognized "that the Court previously denied Storag's initial motion for leave to file under seal, and subsequent motion for reconsideration."  (D.I. 38, at 3).  Yet "notwithstanding the rulings on Storag's initial motions," Baker Hughes asserted, "good cause exists" to seal its Sur-Reply.  (D.I. 38, at 3).

The District Court did not rule on the unopposed motion of Baker Hughes to file its Sur-Reply under seal.  The Court instead issued a Memorandum Order on January 23, 2020, appointing a Special Master to address Baker Hughes's unopposed motion to file its Sur-Reply under seal, to address any future motions to seal filings, and to determine whether the redacted filings previously filed, in some instances by

Storag and in others by Baker Hughes (D.I. 22, 23, 24, 36, and 37), "comply with Supreme Court and Third Circuit law." Memorandum Order, January 23, 2020, at 4. (D.I. 40).

The Court's Memorandum Order appointing a Special Master contained a number of observations that provided additional context for the appointment.  The Court observed:

> Unopposed motions to seal are filed regularly with this Court. Judge Andrews noted recently that "[i]n [his] experience, corporate parties in complex litigation generally prefer to litigate in secret." *Takeda Pharm. U.S.A., Inc. v. Mylan Pharm., Inc.*, Civ. Act. No. 19-2216-RGA (Dec. 19, 2019) at 1. I similarly find that parties in my civil cases routinely ask to seal pleadings that cannot reasonably be characterized as disclosing confidential or proprietary information. And in my (albeit short) tenure on the bench, I cannot recall a party in a civil case opposing a request to seal or objecting to the scope of redactions in the public version of a pleading that was filed pursuant to an order that granted a motion to seal.

> The District Court is not a star chamber. We are a public institution in a democratic republic and the public has a right of access to our filings. That right is founded in the common law and "antedates the Constitution*." Bank of Am. Nat'l Tr. & Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d 339, 343 (3d Cir. 1986). The public's right of access is not absolute; but it is strongly presumed, and it can be overcome only if a party demonstrates that public disclosure of a filing will result in "a clearly defined and serious injury."   *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig*., 924 F.3d 662,672 (3d Cir. 2019).

> The problem I encounter with unopposed motions to seal pleadings is threefold. First, it falls solely on me to scrutinize the proffered justification for the motion without the benefit of the industry knowledge that is often necessary to determine if a clearly defined and serious injury would result if I denied the motion. Second, if I grant the motion—and I almost always do—it falls solely on me to scrutinize the

redactions in the movant's subsequently filed public version of the pleading. Here again, I lack industry knowledge to guide me in assessing whether the proposed redactions are necessary to avoid a clearly defined and serious injury. Third, because of my caseload, I lack time. I currently have on my docket 582 civil cases (including 288 patent cases, of which 119 are Abbreviated New Drug Act cases), 22 criminal cases, 10 miscellaneous actions, and 342 pending motions. I have 32 trials and 25 patent claim construction hearings scheduled for the remainder of this year. I simply do not have the time to review parties' proposed redactions in a meaningful way to ensure that those redactions do not violate the public's right of access.

Memorandum Order (D.I. 40, at 1-3).

The material the parties seek to seal and redact is, to a substantial extent, already in the public domain.  In this litigation, the Order by Judge Andrews on August 29, 2019, which denied Storag's initial motion to file under seal, had the effect of immediately releasing into the public domain, on this Court's public docket, all of the filings that were submitted to that point.  Those now-public filings included as an exhibit to a Declaration filed in support of its initial § 1782 application, an exhibit containing the entire First Arbitration Award rendered by the DIS in Germany. (D.I. 5, Exhibit C).  Storag sought to have this Declaration, and the accompanying exhibits, including the telltale Exhibit C, sealed.  The Court rejected Storag's sealing motion, and Exhibit C has since been in the public domain, for all the world to see.

Additionally, litigation related to the dispute was also filed in the United States District Court for the Southern District of Texas.  *Triuva v. Baker Hughes,*

*Inc.*, Civil No.H-15-2774 (S.D. Tex. 2017).  Many of the filings that were already submitted in the Texas litigation are available to the public on the docket of the District Court for the Southern District of Texas, and some of the information the parties seek to file under seal in this Delaware District Court litigation is also already in the public domain accessible on the public docket of the United States District Court for the Southern District of Texas.

## II.  The Submissions of the Parties

### A.    The Parties' Characterizations of the Sealed and Redacted Material

Storag has characterized its redactions as falling within five discrete categories: (1) information concerning the German DIS Tribunal's procedural orders; (2)  information that would identify the nature of the parties' claims in the German arbitration; (3) information that would identify the parties to the arbitration; (4) information concerning the existence of the arbitration; and (5) information concerning the Award in the First Arbitration. *Storag Submission on the Special Master's Assigned Dutie*s at 4-5.

Baker Hughes identifies two categories of information that merit sealing. "The first category is specific information regarding the underlying Arbitration." *Baker Hughes Brief* at 4.  According to Baker Hughes, this is information "which Storag never should have disclosed in the first place, even to the District Court." *Id.* The second category "is commercially-sensitive information regarding certain

contracts and the performance thereunder." *Id.*  Baker Hughes argues that "[n]one of this information is necessary in order for the public to understand any rulings by the Court on Storag's Application." *Id.*

## B.    Summary of the Parties' Positions

Storag's argument for continued sealing and redaction is largely a reprise of its prior submissions to the Court regarding sealing.  Storag relies principally on the confidentially mandate that it asserts is required under the German DIS arbitration rules.  *Storag Submission* at 3-5.  To reinforce its position, Storag makes an additional related argument that the contractual agreement between the parties to submit any disputes arising from the underlying contract to private DIS arbitration in Germany constitutes a "a binding contractual obligation" not to disclose certain information, to which this Court is required to defer.  *Id.*

Baker Hughes also broadly supports extensive sealing and redactions.  The arguments advanced by Baker Hughes with regard to the first category it identifies— information "regarding the underlying Arbitration"—are in many respects in alignment with those advanced by Storag.  Both parties generally claim that the German DIS confidentiality rules should dictate policy, and this Court should defer to those rules.  Baker Hughes thus asserts that "the German parties specifically contracted to resolve any disputes outside of the public view and to keep confidential any information related to such private proceedings," an argument essentially

identical to the position on this issue advanced by Storag. *Baker Hughes Brief* at 6.

In a more nuanced sense, however, the position of Baker Hughes regarding information concerning the underlying German DIS proceedings is adversarial to Storag.  Baker Hughes blames Storag for the entire problem facing this Court.  A resonant leitmotif of the argument advanced by Baker Hughes is that Storag breached Storag's confidentiality obligations by the very commencement of this § 1782 proceeding. Baker Hughes argues that it should not have its privacy and confidentiality expectations upended by what it considers to be Storag's impermissible maneuver in filing its §1782 application, which placed the German DIS confidentiality rules in tension with the principles favoring public access that apply in American federal courts.  *See Baker Hughes Brief* at 1, 3, 4, 5, 9, 11.[2]

### III.  Applicable Legal Principles

### A.    The Three Tiers of Review

Three discrete bodies of law govern the principles pertaining to confidentiality, sealing, and redactions of documents in federal court litigation. They apply in ascending orders of scrutiny.

First, there are principles governing the issuance of protective orders in federal litigation.  These principles emanate from Rule 26(c) of the Federal Rules of Civil

---

[2] The arguments of the parties, including engagement with their proffered legal authorities, are discussed in greater detail in the portion of this Report and Recommendation applying the applicable legal principles to this record.

Procedure, and the attendant gloss courts have applied to the application of Rule 26(c).  *See Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 783-92 (3d Cir. 1994).

Second, federal courts recognize a common law right of access to judicial records.  "The existence of a common law right of access to judicial proceedings and to inspect judicial records is beyond dispute." *Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059, 1066 (3d Cir. 1984). There is a "presumption in favor of access to 'public records and documents, including judicial records and documents.'" *Bank of America National Trust & Savings Association v. Hotel Rittenhouse Associates*, 800 F.2d at 343, *quoting Nixon v. Warner Communications, Inc*., 435 U.S. 589, 597 (1978).

Third, "the public and the press have a First Amendment right of access to civil trials." *Avandia*, 924 F.3d at 673, *citing Publicker*, 733 F.2d at 1070. "[T]he First Amendment, independent of the common law, protects the public's right of access to the records of civil proceedings."  *Republic of Philippines v. Westinghouse Electric Corporation*, 949 F.2d 653, 659 (3d Cir. 1991), *citing Publicker*, 733 F.2d at 1070.  "The First Amendment right of access requires a much higher showing than the common law right to access before a judicial proceeding can be sealed." *In re Cendant Corp.*, 260 F.3d at 198 n. 13.  Any restriction on the First Amendment right of public access is "'evaluated under strict scrutiny.'" *Avandia*, 924 F.3d at 673, *quoting PG Publishing Company v. Aichele*, 705 F.3d 91, 104 (3d Cir. 2013).

## B.     Protective Orders

Rule 26 of the Federal Rules of Civil Procedure permits the District Court to enter a protective order to shield a party "from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1).

The matters here pending before the District Court and referred to the Special Master do not involve any motion for a protective order.  Even so, as the Third Circuit's decision in *Avandia* emphasized, it is worth reciting the standards applicable to motions for protective orders, as a foil against which to contrast the more rigorous standards imposed by the common law and the First Amendment. *Avandia,* 924 F.3d at 673.

Within the Third Circuit, the principles applicable to the issuance of a protective order are governed by the "good cause" factors announced in *Pansy v. Borough of Stroudsburg*, 23 F.3d at 783-92.

> In *Pansy*, the Third Circuit identified eight factors that may be considered in evaluating whether good cause exists: (1) whether disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate purpose; (3) whether disclosure will cause embarrassment to a party; (4) whether the information to be disclosed is important to public health and safety; (5) whether sharing the information among litigants will promote fairness and efficiency; (6) whether the party benefitting from the order is a public entity or official; (7) whether the case involves issues important to the public; and (8) the parties' reliance on the order.

*Genentech, Inc. v. Amgen Inc.*, No. CV 17-1407-CFC, 2019 WL 1349464, at *2 (D. Del. Mar. 26, 2019) (Connolly, J.).

As prologue to the common law and First Amendment standards applicable to the sealing of judicial records, it is important to emphasize that the *Pansy* factors governing the grant of protective orders in the Third Circuit do not constitute a "free pass" to litigants to seek and obtain protective orders on their mere mutual consent or acquiescence.  Protective orders require a showing of "good cause," and "good cause" requires more than the mere coalescence and convenience of the parties.  "Rule 26(c) places the burden of persuasion on the party seeking the protective order.  To overcome the presumption, the party seeking the protective order must show good cause by demonstrating a particular need for protection." *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986).  Generalized boilerplate assertions of harm are not sufficient. *See Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 484 (3d Cir. 1995) ("Under *Pansy*, '[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning' do not support a good cause showing.'"), *quoting Cipollone*, 785 F.2d at 1121.

Protective orders entered pursuant to Rule 26(c) are most soundly justified when the documents at issue contain trade secrets or other confidential business information.  *See Leucadia, Inc. v. Applied Extrusion Technologies, Inc.*, 998 F.2d 157, 166 (3d Cir. 1993).  Yet even trade secrets are not sacrosanct.  The "Rules also explain that 'courts have not given trade secrets automatic and complete immunity against disclosure, but have in each case weighed their claim to privacy against the

16

need for disclosure.'" *Id*., *quoting* Fed. R. Civ. P. 26(c) Advisory Committee's Note to 1970 Amendment.

## C.   The Common Law Right of Access

### 1.   Overview of Right

The United States Supreme Court recognized the common law right of access to judicial records in *Nixon v. Warner Communications, Inc*., 435 U.S. at 597 ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents.").

In the Third Circuit, the right is particularly robust.  "The right to inspect and copy, sometimes termed the right to access, antedates the Constitution." *United States v. Criden*, 648 F.2d 814, 819 (3d Cir. 1981).  Powerful public interests undergird the right. "It has been justified on the ground of the public's right to know, which encompasses public documents generally, and the public's right to open courts, which has particular applicability to judicial records." *Id*.  "The public's exercise of its common law access right in civil cases promotes public confidence in the judicial system by enhancing testimonial trustworthiness and the quality of justice dispensed by the court."  *Littlejohn v. Bic Corp*., 851 F.2d 673, 678 (3d Cir. 1988), *citing* 6 J. Wigmore, Evidence § 1834 (J. Chadbourne rev. 1976). "As with other branches of government, the bright light cast upon the judicial process by public observation diminishes possibilities for injustice, incompetence, perjury, and

fraud." *Littlejohn*, 851 F.2d at 678. Moreover, "the very openness of the process should provide the public with a more complete understanding of the judicial system and a better perception of its fairness." *Id.* "[A]ccess to civil proceedings and records promotes 'public respect for the judicial process' and helps assure that judges perform their duties in an honest and informed manner." *In re Cendant Corp.*, 260 F.3d at 192, *quoting Leucadia*, 998 F.2d at 161.

## 2. Defining "Judicial Record"

Given that it is firmly established that the common law presumption of access applies to "judicial records and documents," the case law in the Third Circuit has focused not on the existence of the presumption, but instead on what does or does not qualify as a "judicial record" or "document" within the meaning of the common law right of access. The unmistakable arc of that case law has been a steady expansion of the records and documents to which the right attaches.

"The common law right of access is not limited to evidence, but rather encompasses all 'judicial records and documents.'" *United States v. Martin*, 746 F.2d 964, 968 (3d Cir. 1984), *quoting Nixon v. Warner Communications*, 435 U.S. at 597. "It includes 'transcripts, evidence, pleadings, and other materials submitted by litigants." *United States v. Martin*, 746 F.2d at 968, *quoting*, Comment, *All Courts Shall Be Open: The* Public's *Right to View Judicial Proceedings*, 52 Temple L.Q. 311, 337-38 (1979). The Third Circuit further extended the right to a settlement

18

agreement in *Bank of America*, holding that that the presumption in favor of public access applies not only to all civil trials and records but also to "motions filed in court proceedings." *Bank of America*, 800 F.2d at 343.  In *Republic of Philippines v. Westinghouse*, the Third Circuit extended the right to "papers filed in connection with a motion for summary judgment." *Westinghouse*, 949 F.2d at 661.  In *Leucadia,* the Third Circuit summarized its extant decisions by observing that, "our earlier decisions and those in other courts lead ineluctably to the conclusion that there is a presumptive right of public access to pretrial motions of a nondiscovery nature, whether preliminary or dispositive, and the material filed in connection therewith." *Leucadia*, 998 F.2d at 164.

The key to determining whether or not a document or record is subject to the right of access is whether it is properly denominated a "judicial record." *In re Cendant Corp*., 260 F.3d at 192.  "The status of a document as a 'judicial record,' in turn, depends on whether a document has been filed with the court, or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings." *Id.*  "While filing clearly establishes such status, a document may still be construed as a judicial record, absent filing, if a court interprets or enforces the terms of that document, or requires that it be submitted to the court under seal." *Id*., *citing Enprotech Corp. v. Renda*, 983 F.2d 17, 20 (3d Cir. 1993).

As Judge Andrews for this Court has explained, this divide is especially

significant.  *In re Application of Ewe Gasspeicher GmbH*, 2020 WL 1272612, at *3 ("For requests to preserve the confidentiality of discovery materials pursuant to a protective order, the Court applies the factors set forth in *Pansy . . . See In re Avandia Mktg*., 924 F.3d at 670. When, however, the parties file those discovery materials on the court's docket under seal, they become "judicial records" subject to the more rigorous common law right of access. *Id*. at 672. Finally, the First Amendment right of public access attaches to civil trials. *Id*.").

### 3.    The Exception for "Discovery Motions"

The documents submitted by Storag and Baker Hughes under review here have all been filed with the Court, and thus they meet the threshold definition of "judicial record."  There is, however, a wrinkle still to be ironed, which is whether the filings submitted by Storag and Baker Hughes constitute "discovery motions and supporting materials."  In *Leucadia*, the Third Circuit held that the common law right of access did *not* attach to discovery motions.  Since the entire matter pending before this Court is an application for discovery under § 1782, the entire proceeding might arguably be regarded as an omnibus discovery motion, exempt from the common law right of access under *Leucadia*.  The parties have argued that pursuant to *Leucadia*, everything filed in this § 1782 proceeding is thus exempt from the common law right of access.

### 4.    The Section 1782 Filings at Issue are Not "Discovery Motions"

The filings in dispute before the Court, however, are not properly understood as "discovery motions" within the meaning of *Leucadia*.  Rather, the filings are more akin to the filing of a Complaint, and a responsive Motion to Dismiss.  In a civil action, a complaint is filed to invoke the judicial power of the federal court, and unless dismissed, discovery follows.  In a § 1782 proceeding, the application is filed to invoke the judicial power of the federal court, and unless rejected, discovery follows.

The issue before the Court in a § 1782 proceeding is whether to *grant* discovery.  The § 1782 Application itself is not a "discovery motion," but is instead an application to invoke the jurisdiction of the federal court in aid of discovery in a foreign proceeding.  In excluding "discovery motions," *Leucadia* relied heavily on the fundamental principle that underlying discovery material *itself* is not a judicial record.  There is no common law right of access to "raw discovery."  *Leucadia*, 998 F.2d at 157.  If in the course of discovery, disputes arise, parties may file "discovery motions" seeking the intervention of a court to resolve the disputes.  Those motions may require attachment of "raw discovery" materials, such as excerpts from depositions or interrogatory answers.  The core learning of *Leucadia* is that the common law right of access does not attach to such motions, or their exhibits containing raw discovery, because this would have the effect of converting material that is normally not a "judicial record" into material that is.  The key passage in

*Leucadia* thus explained that "a holding that discovery motions and supporting materials are subject to a presumptive right of access would make raw discovery, ordinarily inaccessible to the public, accessible merely because it had to be included in motions precipitated by inadequate discovery responses or overly aggressive discovery demands." *Leucadia*, 998 F.2d at 157.

If on the merits Storag's § 1782 application for discovery were to be granted by the District Court, and if subsequent disputes were to develop over compliance with the Court's order, an ensuing motion that referenced issues surrounding such "raw discovery," and any exhibits from that raw discovery attached to that motion, *could* constitute a "discovery motion" within the meaning of *Leucadia*. The current filings of the parties at the current stage, however, which contest whether the German DIS arbitration proceedings constitute a "foreign tribunal" and whether the other *Intel* factors governing § 1782 are satisfied, are not "discovery motions" at all, but rather filings that speak to the threshold exercise of § 1782 power by the Court.

### 5.     Common Law Access Contrasted with the Rule 26 *Pansy* Factors

The Third Circuit's 2019 decision in *Avandia* strongly emphasized the fundamental divide between the standards that govern the issuance of protective orders under Rule 26 and the standards that govern the presumption of access to judicial records under the common law:

> In short, while the *Pansy* factors may provide useful guidance for courts conducting the balancing required by the common law test, the *Pansy* factors do not displace the common law right of access standard. The difference is not merely semantic—the *Pansy* factors are not sufficiently robust for assessing the public's right to access judicial records.

*Avandia*, 924 F.3d at 676.

In both substance and procedure, the burdens that must be overcome to justify the sealing of judicial records under the common law are dramatically less pliant than the factors to be weighed under *Pansy* in deciding whether a protective order is warranted.  "Unlike the Rule 26 standard, the common law right of access begins with a thumb on the scale in favor of openness—the strong presumption of public access."  *Id.*

As to substance, *Avandia* instructed that in certain critical respects the *Pansy* factors are fundamentally *incompatible* with the Third Circuit's common law right of access jurisprudence.  *Id.*  ("Moreover, some of the *Pansy* factors are incompatible with our case law on the common law right of access.").

For example, the *Pansy* factors invite a court to consider "'whether disclosure of the information will cause a party embarrassment.'"  *Id.*, *citing Glenmede Trust Company v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995).  In contrast, however, "concern about a company's public image, embarrassment, or reputational injury, without more, is insufficient to rebut the presumption of public access."  *Avandia*, 924 F.3d at 666, *citing Westinghouse*, 949 F.2d at 663. *See also Littlejohn*, 851 F.2d

at 685 (reasoning that the proponent of the seal's "desire to preserve corporate reputation" is insufficient to rebut the presumption); *Publicker*, 733 F.2d at 1074 (explaining that public disclosure of poor management is inadequate to justify sealing); *Brown & Williamson Tobacco Corporation v. Federal Trade Commission*, 710 F.2d 1165, 1180 (6th Cir. 1983) (explaining that the desire to shield prejudicial information from competitors and the public is understandable, but "cannot be accommodated by courts without seriously undermining the tradition of an open judicial system.").

So too, *Pansy* permits consideration of "'whether the information is being sought for a legitimate purpose or for an improper purpose.'" *Avandia*, 924 F.3d at 677, *quoting Glenmede*, 56 F.3d at 483. In contrast, a "a person's motive for inspecting or copying judicial records is irrelevant under the common law right of access." *Avandia*, 924 F.3d at 677, *citing Leucadia, Inc.*, 998 F.2d at 167-68; *Bank of America.*, 800 F.2d at 345 ("The applicability and importance of these interests [served by the common law right of access] are not lessened because they are asserted by a private party to advance its own interests.").

The essential substantive command of *Avandia* is that it is error to conflate "the *Pansy* factors with the common law right of access standard." *Avandia*, 924 F.3d at 677. "[T]he *Pansy* factors are not a substitute for the common law right of access standard—which begins with the presumption of access." *Id.* "The scale is

tipped at the outset in favor of access." *Id.*

### 6.   The Substantive Common Law *Avandia* Standards

While not purporting to articulate exhaustively what substantive showings will justify sealing or redacting a judicial record and what showings will not, *Avandia* did provide substantial guidance.

*Avandia* rejected as insufficient an eight-year-old declaration previously submitted to support sealing of other documents, instructing that "[o]utdated evidence such as this is insufficient to overcome the presumption of public access." *Id.* at 678.

*Avandia* also rejected as insufficient a second proffered declaration, dismissing that declaration as deficient because it contained mere "broad, vague, and conclusory allegations of harm." *Id.* In rejecting that declaration, the court held that the declarant's assertion that disclosure of the company's "old research strategies 'would still aid competitors in developing research strategies and could be used to harm GSK's relationship with patients and physicians'" was not enough to rebut the presumption of public access, because the declaration lacked any additional explanation as to why revelation of old strategies would harm present commercial relationships. *Id.* at 679. These were the very sort of "blanket assertions of harm" that the *Avandia* court declared "fall short of the clearly defined and serious injury" required for sealing. *Id.*

Finally, *Avandia* sharply disqualified "reputational injury" or mere "embarrassment" as interests sufficient to overcome the presumption of access. On the record before it, the Court declared that it could not see how the alleged harm "chalks up to anything more than mere embarrassment." *Id.* But "[m]ere embarrassment is insufficient to overcome the strong presumption of public access inherent in the common law right." *Id.*, *citing Publicker*, 733 F.2d at 1074 (explaining that courts generally should not seal evidence of "bad business practice[s]."). In a critical insight, the Court in *Avandia* noted that the values served by public access may be at their apex when the motivation for sealing is embarrassment at what the disclosed material might reveal. "'Indeed, common sense tells us that the greater the motivation a corporation has to shield its operations, the greater the public's need to know.'" *Id.*, *quoting Brown & Williamson Tobacco Corp.*, 710 F.2d at 1180.

On the affirmative side of the ledger, *Avandia* confirmed the long-standing truism that the presumption of public access is "'not absolute.'" *Avandia*, 924 F.3d at 672, *quoting Bank of America*, 800 F.2d at 344. The presumption of public access *may* be overcome. The critical divide is the distinction between material containing palpable trade secrets or proprietary business practices that will produce present commercial and competitive harm, on the one hand, and vague, conclusory assertions of commercial or competitive harm, or assertions that in fact appear

grounded in reputational interests and embarrassment, on the other.   A party's

"'vague assertions that the transcript contains secretive business information, and

that disclosure would render [it] at a tactical disadvantage' [are] insufficient to

overcome that strong presumption." *Avandia*, 924 F.3d at 676, *quoting LEAP Sys.,*

*Inc. v. MoneyTrax, Inc.*, 638 F.3d 216, 221-22 (3d Cir. 2011). The touchstone is the

persuasive demonstration of specific, concrete, particularized of harm.[3]

### 7.    The *Avandia* Procedural Requirements

As to procedure, *Avandia* also contemplates a rigorous process of judicial

review.  The right of access must not be demoted to "a mere formality."  *Avandia*,

924 F.3d at 676.  To ensure that proper weight is given to "the public's strong interest

in the openness of judicial records," a District Court must engage in "a document-

by-document review."  *Id*.   Casual, superficial review does not suffice.  "Again, the

strong presumption of openness inherent in the common law right of access

'disallows the routine and perfunctory closing of judicial records.'" *Id.*, *citing In re*

*Cendant Corp.*, 260 F.3d at 193-94.

The substantive and procedural standards that must be met to overcome the

presumption of access are onerous by definition and design. The party seeking to

---

[3] Because motions to seal material so commonly occur in commercial and corporate
litigation, the vocabulary through which courts describe the harm often references
trade secrets and proprietary business practices.  But harms sufficiently specific and
serious might also be demonstrated in non-business litigation contexts, in which
compelling privacy, safety, health, or similar interests are at stake.

seal judicial records must satisfy "a heavy burden." *Miller v. Indiana Hospital*, 16 F.3d 549, 551 (3d Cir. 1994).  The party seeking to have a record sealed "must show that 'the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure.'" *Avandia*, 924 F.3d at 677-78, *quoting Miller*, 16 F.3d at 55.  In granting a sealing order, a "District Court should articulate 'the compelling[,] countervailing interests to be protected," make "specific findings on the record concerning the effects of disclosure, and provide[ ] an opportunity for interested third parties to be heard.'" *Avandia*, 924 F.3d at 677-78, *quoting In re Cendant Corp.*, 260 F.3d at 194. "'In delineating the injury to be prevented, specificity is essential.'" *Id.* Generalized incantations that secrecy is required to prevent competitive or commercial harm are not enough to carry the movant's burden. "'Broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient.'"  *Id.*

The factfinding required by district courts must be careful and meticulous in order to vindicate the rights of the public and the integrity of the judicial process itself, notwithstanding the private interests or preferences of the litigants, even when they are in agreement.   "'[C]areful factfinding and balancing of competing interests is required before the strong presumption of openness can be overcome by the secrecy interests of private litigants.'" *Avandia*, 924 F.3d at 677-78, *quoting Leucadia*, 998 F.2d at 167.

The Third Circuit's *Avandia* opinion mandates a "document-by-document" review of the claimed propriety of sealing.  In conducting that review, the Court may sensibly acknowledge that there may be snippets of material that satisfy the onerous burden required to justify sealing.  In such instances, however, only the "snippet" itself may be sealed.  *See In re Petrobras Sec. Litigation*, 393 F. Supp. 3d 376, 387 (S.D.N.Y. 2019) ("Nonetheless, a few of the documents—or, more likely, a few sentences within a few of the documents—may still contain 'business information that might harm a litigant'' competitive standing.'  . . . Petrobras has satisfied this Court that some of the sealed documents might still contain snippets of information that even the now much-reorganized Petrobras could reasonably claim were still commercially sensitive.") (internal citations omitted); *Ebert v. C.R. Bard, Inc*., No. CV 12-01253, 2020 WL 429771, at *3 (E.D. Pa. Jan. 28, 2020) ("Although Bard asks for the entirety of the expert reports to be sealed, a less restrictive alternative is available. The Court will instead only permit to be redacted those pages of the expert reports that Bard expressly identified as containing confidential business information in its Motion.").

In a footnote, *Avandia* clarified that the Third Circuit does not "require a district court to provide lengthy, detailed discussion of each individual document." *Avandia*, 924 F.3d at 677, n.11. "Yet it must be clear from the record that the district court engaged in a particularized, deliberate assessment of the standard as it applies

to each disputed document." *Id.*

### 8.     The Changed Landscape After *Avandia*

*Avandia* was a game-changer, as District Court opinions applying it in this Circuit have recognized.   *Avandia* struck at the heart of the prevalent practice of collusive secrecy in corporate litigation.   It is a common practice for parties in corporate cases to file reciprocal unopposed motions to seal, in what often to amounts to a "I will scratch your secrecy back if you will scratch mine" bargain. Applying *Avandia*, Judge Andrews observed:

> In my experience, corporate parties in complex litigation generally prefer to litigate in secret. To that end, discovery is over-designated as being confidential, pleadings and briefs are filed under seal, redacted versions of sealed documents are over-redacted, requests are made to seal portions of transcripts of judicial proceedings, and parties want to close the courtroom during testimony. I have tried over the years to reign these tendencies in, but it is difficult because there is usually no one opposing whatever requests are made, and I do not have time to be independently monitoring any of these tendencies unless they are directly requested of me (i.e., requests to close the courtroom and to seal judicial transcripts). I have made some efforts on the requests that are specifically directed to me. I think some of those efforts have resulted in greater exercise of discretion by the parties in asking to have judicial transcripts sealed and in seeking to close the courtroom, but I do not see any impact on any of the other areas of potential abuse.

> In cases like *Avandia*, there is a third party that seeks access to the challenged documents, which is not the case here. The courts of appeals perhaps do not have as much opportunity to instruct on what a trial court should be doing when no party is advocating for openness. Nevertheless, it seems to me that courts should at least address access concerns when they come to the court's attention.

*Takeda Pharmaceuticals U.S.A., Inc. v. Mylan Pharmaceuticals, Inc*., No. CV 19-2216-RGA, 2019 WL 6910264, at *1 (D. Del. Dec. 19, 2019).

In the wake of *Avandia*, District Courts "must articulate compelling and countervailing interests to be protected, make specific findings on the record concerning the effects of disclosure and provide an opportunity for third parties to be heard." *Ebert v. C.R. Bard, Inc*., 2020 WL 429771, at *2, *citing Avandia*, 924 F.3d at 672-73.

The District Court's decision applying *Avandia* in *Midwest Athletics & Sports All. LLC v. Ricoh USA, Inc.*, 395 F. Supp. 3d 461, 462 (E.D. Pa. 2019), is instructive. In *Midwest*, both parties had filed motions to seal. Rejecting both motions, the court noted that the "parties make no showing that disclosure of the exhibits contain confidential commercial or proprietary information." *Id*. "Although the parties may agree to shield information contained in discovery materials," the court stated, "they may not do so once those materials become part of the court record." *Id. "*Sealing orders may not be routinely entered without the rigorous analysis required." *Id*. In rejecting the sealing motions, the court held that none of the materials proffered for sealing any confidential material that could cause harm within the meaning of the *Avandia* standard. *Id.*

## D.   The First Amendment Right of Access to Civil Judicial Proceedings

### 1.   Overview

The Third Circuit has recognized a First Amendment right of access to judicial proceedings in civil cases. *Avandia*, 924 F.3d at 673; *Publicker*, 733 F.2d at 1070; *Delaware Coalition for Open Government, Inc. v. Strine*, 733 F.3d 510, 514 (3d Cir. 2013) ("We have found a right of public access to civil trials, as has every other federal court of appeals to consider the issue.").   That much is clear.  What is less clear is the nature of the judicial records to which that First Amendment right attaches in civil cases.

### 2.    The Avoidance Doctrine

In *Avandia*, the Third Circuit panel invoked the "avoidance doctrine" and decided, by a 2-1 vote, not to reach the question of whether the First Amendment right of access applies to judicial records filed in summary judgment proceedings. Judge Restrepo, concurring in part and dissenting in part, filed an opinion arguing that the "avoidance doctrine" ought not be applied.  Judge Restrepo reached the First Amendment question and opined that the First Amendment right of access did attach to summary judgment findings.   *Avandia*, 924 F.3d at 681-84 (Restrepo, J., concurring in part and dissenting in part).

The "avoidance doctrine" is a permissive and prudential principle of judicial restraint.  The doctrine embraces the proposition that "a federal court should not decide federal constitutional questions where a dispositive nonconstitutional ground is available." *Hagans v. Lavine*, 415 U.S. 528, 547 (1974).  In *Avandia*, the majority

found the common law presumption of access "dispositive," and therefore declined to rule on the First Amendment question. *Avandia*, 924 F.3d at 680. As already noted, Judge Retrespo was not convinced that the common law analysis was dispositive and went on to reach the First Amendment question. *Id*. at 681-84 (Restrepo, J., concurring in part and dissenting in part).

The gravitational force of the avoidance doctrine increases as litigation moves upward. Appellate courts presented with alternative grounds for affirmance or reversal of a judgment below are naturally and appropriately drawn to render a decision on the narrowest practicable ground. Values of judicial restraint caution against reaching the resolution of constitutional issues when the matter at hand may be disposed of on less profound terms.

In contrast, for structural reasons inherent in the hierarchy of judicial review, Federal District Courts hearing matters in the first instance, and by extension, Special Masters appointed as adjuncts to facilitate the exercise of their judicial authority, must often reach constitutional issues that an appellate court may later choose to avoid. A ruling in the alternative, deciding a matter on both non-constitutional and constitutional grounds, affords a reviewing court the advantage–should it conclude that the non-constitutional grounds are not sufficient to sustain the judgment–to then review the alternative constitutional basis for the ruling.

### 3. The Substantive First Amendment Standards

While the majority in *Avandia* did not decide whether or not the First Amendment right of access applied to the documents before it, the majority did elaborate at some length on the substantive First Amendment standards that would be applicable *if* the First Amendment right were to apply.

The majority in *Avandia* thus declared that "[t]he First Amendment right of access requires a much higher showing than the common law right [of] access before a judicial proceeding can be sealed." *Id*. at 673, *citing In re Cendant Corp*., 260 F.3d at 198 n.13. "Any restriction on the right of public access 'is . . . evaluated under strict scrutiny.'" *Avandia*, 924 F.3d at 673, *citing PG Publishing Co*., 705 F.3d at 104. "If the First Amendment right of access applies, "there is a presumption that the proceedings will be open to the public." *Avandia*, 924 F.3d at 673, *citing Publicker*, 733 F.2d at 1073. The party seeking closure may rebut the presumption of openness only if it is able to demonstrate "an overriding interest [in excluding the public] based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Avandia*, 924 F.3d at 673, *citing Publicker*, 733 F.2d at 1070 (explaining that "to limit the public's access to civil trials there must be a showing that the denial serves an important governmental interest and that there is no less restrictive way to serve that governmental interest.").

*Avandia* further instructed that in determining whether a First Amendment right of access applies to judicial records such as those filed in summary judgment

proceedings, courts must apply the two-prong "experience and logic" test that has been adopted across the landscape of First Amendment jurisprudence to decide access questions.  *Avandia*, 924 F.3d at 673.

### 4.    Application of the Logic and Experience Standard Test

A proceeding qualifies for the First Amendment right of public access when "there has been a tradition of accessibility" to that kind of proceeding, and when "access plays a significant positive role in the functioning of the particular process in question." *Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 10, (1986).  "In order to qualify for public access, both experience and logic must counsel in favor of opening the proceeding to the public."  *Delaware Coalition*, 733 F.3d at 514.

In *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249 (4th Cir. 1988), the Fourth Circuit, citing the Third Circuit's holding in *Publicker*, held that "the more rigorous First Amendment standard should also apply to documents filed in connection with a summary judgment motion in a civil case."  *Id.* at 253, *See Publicker*, 733 F.2d at 1067-71.  The Second Circuit, finding *Rushford* persuasive, adopted the same position in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 124 (2d Cir. 2006). Among other rationales, the Second Circuit reasoned that when a First Amendment right of access attaches to a judicial proceeding itself, the norm should be that the right also attaches to documents filed in those proceedings, observing that "'[o]ther circuits that have addressed [the] question have construed

the constitutional right of access to apply to written documents submitted in connection with judicial proceedings that themselves implicate the right of access.'" *Id.*, *quoting Matter of New York Times Co.*, 828 F.2d 110, 114 (2d Cir. 1987), *citing In re Washington Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986); *Associated Press v. United States District Court*, 705 F.2d 1143, 1145 (9th Cir. 1983).

### 5.     The First Amendment and Section 1782 Proceedings

The justifications for treating the First Amendment right of access as attaching to the filings in a § 1782 application are even more powerful than the justifications for applying the right to summary judgment filings.  As already noted, an application under § 1782 is akin to a complaint filed in a civil action, the gateway document to invoking a federal court's judicial power.

Section 1782 was enacted by Congress as an exercise in international comity. Yet comity only goes so far.  *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir. 1971) ("Comity is a recognition which one nation extends within its own territory to the legislative, executive, or judicial acts of another. It is not a rule of law, but one of practice, convenience, and expediency. Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation.").

The First Amendment is not invisible in § 1782 proceedings.  *In re Application of Ewe Gasspeicher GmbH*, 2020 WL 1272612, at *3 (Observing, in a § 1782

proceeding, that "the First Amendment right of public access attaches to civil trials.").

A party from whom discovery is sought in a § 1782 application, for example, may claim that the material sought is sheltered from disclosure under the First Amendment.  Such a First Amendment defense to production under § 1782 was interposed in *Chevron Corp. v. Berlinger*, 629 F.3d 297, 310 (2d Cir. 2011), in which the applicant sought release of "outtakes" from the production of a documentary film for use in defending proceedings in Ecuador.  While in *Chevron* the Second Circuit ultimately determined that the First Amendment "journalist's privilege" recognized in that Circuit did not bar access to the outtakes sought, the *application* of First Amendment principles to the underlying § 1782 proceedings was treated as self-evident.  *Id.*

Consider another analogy.  Principles of comity do not extend so far as to require American courts, when assisting foreign tribunals in the adjudication or enforcement of judgments, to violate fundamental principles of public policy, including the First Amendment guarantees that American courts are constitutionally bound to respect.  For example, a federal statute, the SPEECH Act, 28 U.S.C. § 4102, states: "a domestic court shall not recognize or enforce a foreign judgment for defamation unless the domestic court determines that . . . the defamation law applied in the foreign court's adjudication provided at least as much protection for freedom

of speech and press in that case as would be provided by the first amendment to the Constitution of the United States and by the constitution and law of the State in which the domestic court is located." *Id*. § (a)(1)(A). "Congress enacted the SPEECH Act in 2010 in response to the perceived threat of 'libel tourism,' a form of international forum-shopping in which a plaintiff chooses to file a defamation claim in a foreign jurisdiction with more favorable substantive law." *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 487 (5th Cir. 2013).

Even prior to enactment of the SPEECH Act, American courts had refused to enforce foreign libel judgments rendered under foreign rules of decision that would violate First Amendment principles if the case were litigated in the United States. *See Bachchan v. India Abroad Publications Inc.*, 154 Misc. 2d 228, 585 (Sup. Ct. NY Cnty. 1992) (stating that the First Amendment "would be seriously jeopardized by entry of [a] foreign libel judgment granted pursuant to standards deemed appropriate in England but considered antithetical to the protections afforded [to] the press by the U.S. Constitution"); *Telnikoff v. Matusevitch*, 347 Md. 561, 702 A.2d 230, 251 (1997) ("[A]t the heart of the First Amendment … is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern. The importance of that free flow of ideas and opinions on matters of public concern precludes Maryland recognition of Telnikoff's English libel judgment.").

To be sure, the rule that American courts may not enforce a foreign defamation judgment that runs contrary to American free speech principles is not directly on point with whether the filings in this § 1782 proceeding should be open to the public under the common law and First Amendment principles that govern litigation in this Court.  But the analogy is strong.  If the First Amendment trumps comity in the context of American enforcement of foreign judgments, the First Amendment should also trump comity in preserving the powerful presumptions of public access that attach to proceedings in American courts.

For the reasons articulated, this Report and Recommendation finds that the First Amendment right of access attaches to the filings of the parties in this § 1782 proceeding, over and above the common law right of access.

### IV.  Recommended Resolution of the Pending Sealing Matters

### A.    Document-by-Document Review

As required by the Third Circuit, decisions on the resolution of the matters assigned to the Special Master and upon which this Report and Recommendation are based are grounded in the Special Master's document-by-document review. The parties have sensibly grouped the sealings and redactions into various categories. This Report and Recommendation is organized in alignment with those

characterizations, with references and examples to specific documents or portions of documents reviewed as associated with each category.[4]

### B.   Information Concerning the Arbitration Other than the First Arbitration Award Itself Should Not be Sealed

Storag and Baker Hughes have both extensively redacted rudimentary information regarding the underlying German DIS arbitration. As previously noted, Storag describes this material as encompassing: (1) information concerning the German DIS Tribunal's procedural orders; (2) information that would identify the nature of the parties' claims in the German Arbitration; (3) information that would identify the parties to the Arbitration; and (4) information concerning the existence of the arbitration. *Storag Submission* at 4-5. Baker Hughes refers to such information more generically as "specific information regarding the underlying Arbitration." *Baker Hughes Brief* at 4. However labeled, both parties in their filed submissions have expansively redacted information concerning the *very existence* of the arbitration, information identifying the parties to the arbitration, information

---

[4] The Special Master acknowledges and has carefully reviewed the many helpful submissions of the parties, including the detailed chart submitted by Baker Hughes, to assist in the hearing conducted in this matter and subsequently filed on the Court's Docket, in parsing and analyzing, document-by-document and redaction-by-redaction, the issues here pending.

concerning the German DIS Tribunal's procedural orders, and information identifying the nature of the parties' claims in the arbitration.[5]

The sealing of this information cannot be justified under the common law principles articulated in *Avandia*, nor under the First Amendment right of access to judicial records.

The notion that parties could litigate the propriety of a § 1782 application while hiding from the public the very *existence* of the arbitral tribunal that allegedly supports discovery, the identity of the parties to that dispute, the procedural orders relating to the proceeding, and the basic nature of the claims in that arbitral proceeding, is fundamentally inconsistent with a federal court's responsibilities in adjudicating a § 1782 application.

The central statutory predicate for the invocation of the federal judicial power in § 1782 proceedings is that the application be in aid of "a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782 (a). The additional *Intel* factors include an assessment of: "(1) whether the evidence sought is within the foreign tribunal's jurisdictional reach, and thus accessible absent section 1782 aid; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-

---

[5] This Report and Recommendation deals separately, in the next section of the Report, with the more detailed information filed in exhibits, including exhibits containing the First Arbitration Award.

court judicial assistance; (3) whether the request conceals an attempt to circumvent foreign proof gathering restrictions or other policies of a foreign country or the United States; (4) whether the subpoena contains unduly intrusive or burdensome requests." *In re O'Keeffe*, 646 Fed. App'x. 263, 266 (3d Cir. 2016), *citing Intel*, 542 U.S. at 264-65.

Any meaningful public understanding of the Court's adjudication of this contested § 1782(a) proceeding under these standards will be unintelligible and incoherent in the absence of disclosure of the rudimentary "who, what, when, where" facts relating to the dispute being litigated in the foreign tribunal.   The public cannot sensibly comprehend the Court's decision as to whether grant or deny the § 1782 application without disclosure of such elementary circumstances.

In keeping with the requirement of document-by-document review, the summaries below place these findings in more detailed context.

### D.I. 22

D.I. 22 (the redacted version of sealed D.I. 18), is *Baker Hughes's Memorandum in Opposition to Storag's Application or, Alternatively, to Stay the Proceedings*.   D.I. 22 contains countless redactions of many mundane and simple words or phrases. Here are exemplars of individual words or phrases redacted from public view:

"The Arbitration Panel Constituted Under DIS Rules"

"the Panel"

"the Arbitration Panel"

"the Arbitration"

"German arbitration panel"

"arbitrations"

"in Germany"

D.I. 22 also redacts and hides from public view phrases citing to the German

DIS Rules, or scholarly works elaborating on those DIS Rules.  Here are examples:

"DIS Rules, Art. 38"

"Korinna von Trotha, *German Arbitration Institute (DIS)*, WORLD
ARBITRATION REPORTER 1 (2d ed. 2019)"

D.I. 22 is replete with redactions hiding from public view passages containing

narrative background description of events and proceedings.  Here are examples:

"a now-concluded arbitration in Germany ("First Arbitration") under
the rules of the German Arbitration Institute ("DIS") as required by a
contract with Baker Hughes (Deutschland) GmbH ("BH Germany")"

"subsurface safety valves ("SSSVs") for use in gas storage caverns"

"In the First Arbitration, Storag asserted claims for breach of contract
and warranty regarding alleged defects in the SSSVs. Storag received
reams of documents and information regarding the SSSVs (the same
types of information it now seeks here); the arbitration included over
2,435 pages of briefing and over 1,000 exhibits. *Id*. It involved more
than 20 expert witnesses and 40 reports. *Id*. The evidentiary hearings
lasted ten days, with testimony from 29 witnesses and experts. *Id*. The

issues that were litigated and resolved included costs arising from alleged defects, repair costs, risks associated with the metal used in welds, and BH Germany's knowledge of these risks. *See id.* at ¶ 4. The arbitrators issued their 337-page award on June 7, 2018. *Id.* at ¶ 3."

"in the arbitration particularly with respect to Baker Hughes…." (see Dec. 14, 2015 Hr. Tr. at 4:7-11) and "the discovery that's taken place in the German arbitration did not extend to the BHGE U.S. entities…." *See id.* at ¶ 7 and Ex. 2-E at 16:6-12. Storag's lead counsel in the First Arbitration, Daniel Schnabl of Freshfields—also lead counsel in the present "Second Arbitration" and the same firm seeking Section 1782 discovery here—attended multiple hearings in which Triuva argued for obtaining BHGE documents. *Id.*"

D.I. 22 contains many redactions that are best characterized as legal argument, or application of law to fact, of the sort that form the heart of most legal briefs or legal memoranda submitted in American courts.  Examples include:

"the panel is a *completely* private arbitral body paid for by the parties. Private arbitrations that derive from the parties' agreement"

"Second, the entity that supplies the procedural rules governing the arbitration, the DIS, is likewise not a governmental authority or court"

Considered individually, and considered cumulatively, these redactions render D.I. 22 incoherent and incomprehensible to a public reader.  Take, as an example, one heavily redacted paragraph from the D.I. 22 Memorandum.  Here is what was visible to the public:

Because Storag is required **[redacted material]** *In re App. of Technostroexport*, 835 F. Supp. 695, 697–98 (S.D.N.Y. 1994).

This, of course, is manifestly incomprehensible to any public reader.  It contains only the opening words "Because Storag is required" followed by a citation to federal district court decision from New York.  Here is how the paragraph actually read, with the redacted material inserted in bold:

> Because Storag is required **to seek permission from the panel before seeking discovery—which was not in place until November 6 due to extensive delay caused by Storag—this Application should be stayed until Storag receives permission from the arbitration panel to conduct this discovery. Decl. ¶ 10. Under similar circumstances, at least one other district court has denied a Section 1782 application until such time as the applicant sought and received approval from the arbitration panel.** *In re App. of Technostrovexport*, 835 F. Supp. 695, 697–98 (S.D.N.Y. 1994).

Now, with the inclusion of the redacted material, the passage is fully comprehensible to a public reader. The factual predicate and argument is revealed, as well as the proposition for which the cited case is invoked. The redacted version, in contrast, completely defeats the animating purposes behind the common law and First Amendment presumptions of access. *See Baxter International, Inc. v. Abbott Laboratories*, 297 F.3d 544, 545 (7th Cir. 2002) ("How else are observers to know what the suit is about or assess the judges' disposition of it?  Not only the legislature but also students of the judicial system are entitled to know what the heavy financial subsidy of litigation is producing.  These are among the reasons why very few categories of documents are kept confidential once their bearing on the merits of a suit has been revealed.").

In short, the redactions render D.I. 22 outside any reasonable comprehension to a public reader.  D.I. 22 becomes a jigsaw puzzle with so many pieces missing that the viewer can only guess at what the image depicted might be.

### D.I. 23

D.I. 23 is the public redacted version of D.I. 19, a Declaration submitted by Baker Hughes in support of its *Memorandum in Opposition*.  D.I. 23 was essentially redacted in its entirety.  While small fragments of text are visible to the public, virtually of the Declaration remains sealed.  For example, the Declaration begins by redacting the identity of the Declarant, Franz T. Schwarz.  It is revealed that Mr. Schwarz is a partner in the law firm of Wilmer Cutler Pickering Hale and Dorr, LLP.  But redacted and not visible to the public are the critical additional facts explaining that Mr. Schwarz represents Baker Hughes (Deutschland) GmbH in its dispute against Storag.  Also hidden is any explanation of his role in his representation from which his personal knowledge comprising the substance of his Declaration was acquired.  The substance of the Schwarz Declaration is then redacted almost in its entirety.  That substance closely parallels the same sort of material redacted by Baker Hughes in D.I. 22, the rudimentary information regarding the DIS arbitration proceedings.  Indeed, as would be expected, the Memorandum filed by Baker Hughes in D.I. 22 largely lifts from the facts recited by Mr. Schwarz in D.I. 23.

In sum, viewing D.I. 23, any public reader would know there was a Declaration by a lawyer supporting Baker Hughes, but not the identity of the lawyer, the basis of the lawyer's knowledge, nor any of the substance recited by the lawyer in the Declaration.

The material redacted in D.I. 23 was not permissibly sealed and kept from public view, either under the common law *Avandia* principles or the First Amendment, for reasons identical to those identified with regard to D.I. 22.

### D.I. 24

D.I. 24 is the public redacted version of D.I. 20, a second Declaration submitted by Baker Hughes in support of its *Memorandum in Opposition*.  To its credit, the Declaration of Mr. Zeve, who is participating as Counsel in the proceeding before this Court, is not heavily redacted.  Even so, the redactions that were made are indistinguishable in their content and tenor from the material already found to be inappropriately redacted in D.I. 22 and D.I. 23.  A few illustrative phrases will suffice to demonstrate the point:  D.I. 24 pervasively redacted words such as "arbitration," and phrases such as: "When the First Arbitration ended," and their synonyms and variations.   More substantively, D.I. 24 redacted descriptions of the timing of events or procedures or the identities of participants.  For example, the D.I. 24 Declaration redacted this passage:

"Daniel Schnabl of Freshfields Bruckhaus Deringer, who I understand

to be lead counsel in the proceeding underlying Storag's current Section 1782 application (the "Second Arbitration"),"

The material redacted in D.I. 24 was not permissibly sealed and kept from public view, either under the common law *Avandia* principles or the First Amendment, for reasons identical to those identified with regard to D.I. 22 and D.I 23.

## D.I. 36

D.I. 36 is the public redacted version of D.I. 33, Storag's *Reply in Further Support of its Application*.  Storag's redactions follow exactly the same pattern as the redactions of Baker Hughes.  Once again, simple generic phrases such as, "in the Arbitration," and their ilk, are redacted throughout.  Once again, citations to scholarly works speaking to the crux of the legal issues contested by the parties, such as citations to the *Stanford Journal of International Law*, are redacted:

> KENNETH BEALE, JUSTIN LUGAR & FRANZ SCHWARZ, SOLVING THE § 1782 PUZZLE: BRINGING CERTAINTY TO THE DEBATE OVER 28 U.S.C. SEC. 1782'S APPLICATION TO INTERNATIONAL ARBITRATION, 47 Stan. J. Int' L. 51, 95 (2011)

And once again, Storag, like Baker Hughes, redacted legal argument, or application of law to fact.  Take, for example, this redaction:

> ("[T]here are no concerns in German law against the use of information legally acquired abroad. This is applicable, in particular, if the powers of a foreign court, such as within the scope of the § 1782 proceeding, are broader than those of a German court would be. The same applies .. . with the DIS [Rules]."). The Tribunal also ruled that Storag was not required to obtain its prior consent before filing its Application,"

The material redacted in D.I. 36 was not permissibly sealed and kept from public view, either under the common law *Avandia* principles or the First Amendment, for reasons identical to those identified with regard to D.I. 22, D.I 23, and D.I. 24.

### D.I. 37

D.I. 37 is the public redacted version of D.I. 34, a Declaration in support of Storag's *Reply in Further Support of its Application*.  D.I. 37 is heavily redacted. The name of the Declarant, Dr. Daniel Schnabl, is redacted.  Also redacted is information explaining Dr. Schnabl's  relationship to the dispute: "I am lead counsel to Storag Etzel GmbH ("Storag") in pending arbitration proceedings against Baker Hughes (Deutschland) GmbH in Germany."

Essentially all of the substantive information contained in Dr. Schnabl's Declaration was redacted. This included recitations of matters involving the German arbitration proceedings and matters surrounding the federal court litigation in the Southern District of Texas.   Here are examples:

> In the First Arbitration, the issue of the full repair costs that Storag already incurred was only litigated and decided with respect to the two caverns that already ruptured due to the serial defect in Baker Hughes Germany's SSSVs. There is also a separate group of 28 caverns (the "28 Caverns") for which the tribunal in the First Arbitration only granted declaratory relief on liability but did not rule on the level of damages to be paid for the full repair not yet incurred at the time. Based on this declaratory judgment, Storag now seeks payment for the costs of fully repairing the 28 Caverns.

49

I appeared before the Texas court on a couple occasions in 2017 and 2018 only to assist with potential factual or legal questions Judge Hughes might have about the First Arbitration. To the best of my recollection, I explained that documents held by or under the control of Baker Hughes were beyond the First Arbitration tribunal's jurisdiction as Baker Hughes was not a party to the First Arbitration. At that time, the present Arbitration was not pending. As far as I am aware, the Texas court has not yet ordered any discovery given Baker Hughes' motion for summary judgment.

The material redacted in D.I. 37 was not permissibly sealed and kept from public view, either under the common law *Avandia* principles or the First Amendment, for reasons identical to those identified with regard to D.I. 22, D.I 23, D.I. 24, and D.I. 36.

### D.I. 41

D.I. 41 is the public redacted version of D.I. 39, Baker Hughes's *Sur-Reply Memorandum in Further Opposition to Storag's Application*. D.I. 41 follows the now-familiar pattern. It redacts countless generic phrases, such as "the Panel." It redacts argumentation in the nature of application of law to fact, such as: "Storag can request in the Arbitration the same documents it seeks here, and to the extent the Panel determines that any of Storag's requests for BHGE documents are proper, BH Germany has committed to producing such documents if ordered to do so."

The material redacted in D.I. 41 was not permissibly sealed and kept from public view, either under the common law *Avandia* principles or the First

Amendment, for reasons identical to those identified with regard to D.I. 22, D.I 23, D.I. 24, D.I. 36, and D.I. 37.

## C. Information Regarding the First Arbitral Award, and other Information Characterized as Commercially Sensitive

Aside from all of the redacted material contained in their various briefs, memoranda, and declarations, none of which, for the reasons articulated above, merit sealing, the parties have attached massive exhibits to those briefs, memoranda, and declarations. These have been filed entirely under seal.  Some of these exhibits, such as recitations from scholarly works, or the German DIS rules in their entirety, are in the public domain, and contain no specific information relating to the merits of the parties' dispute or the First Arbitral Award.  For all the reasons recited above finding that rudimentary information concerning the underlying German DIS arbitrations may not be sealed under common law or First Amendment standards, none of those exhibits warrant sealing, in whole or in part.

This leaves the single most troubling exhibits, displaying in their entirety the initial DIS Award.  The Award is a 337-page document issued on June 7, 2018.  The first DIS Award has been filed in two places on the docket of this Court.  The Award was first filed in its entirety by Storag as an exhibit to its Declaration in support of its initial § 1782 application.  (D.I. 5, Exhibit C).  As previously noted, Storag moved to seal this Declaration, and the accompanying exhibits, including Exhibit C containing the first Award.  The motion was denied by the Court, and a motion for

reconsideration was denied as well, and thus Exhibit C has been in the public domain since August 2019.   For its part, Baker Hughes filed the Award as a sealed exhibit to the Declaration of Franz Schwarz.

If the Court were operating on a clean slate, and if the parties had fulfilled their initial obligations under *Avandia* and the First Amendment, it is certainly plausible that certain specific information contained in the dense 337-page initial Award might have qualified as commercially sensitive information of the sort that might satisfy either the common law *Avandia* standards or the stricter First Amendment standards.

It is inconceivable, however, that *everything* in the Award would have qualified for sealing, or even that *most* of the material in the Award would have qualified for sealing.  Vast sections of the Award contain discussion of German law, DIS procedure, summations of legal argument, invocations of scholarly works, and rudimentary discussion of the basic factual circumstances underlying the dispute, none of which would qualify for sealing under the rationales already explained in this Report and Recommendation, and none of which would qualify as a "trade secret" or "commercially sensitive information" of the sort that would justify sealing under either the common law or the First Amendment.  *See In re Application of Ewe Gasspeicher GmbH*, 2020 WL 1272612, at *4 ("Here, the volume of materials filed under seal—105 documents totaling 1,551 pages—and the lack of an efficient way

to determine what exactly has been redacted, has not made the Court's task easy. Nevertheless, it is readily apparent that certain redacted material cannot meet the standard laid out by the Third Circuit in *Avandia*. For example, in several documents, such as the Ex Parte Application for an Order Pursuant to 28 U.S.C. § 1782 (D.I. 2), EWE Gasspeicher has redacted the name of the respondent, Halliburton, and the name of one of its declarants, Dr. Daniel Schnabl, even though both of those names are publicly displayed on the court docket itself.").

Yet it is also plausible that *some* of the detail contained in the Award, ranging from scientific and technological detail to commercially sensitive contract terms or arrangements, would qualify for sealing.  In each such instance, the party advocating sealing of the *specific* material would have the burden of isolating that specific material and also providing the high levels of justification required for its redaction. Moreover, embarrassment or protection of reputation would not suffice—some more palpable and particularized demonstration of commercial harm would be required.

For two reasons, however, there is no justification for the continued sealing of the copy of the Award attached to the Declaration of Franz Schwarz submitted by Baker Hughes, or for retroactively sealing the already un-sealed copy of the Award in D.I. 5, Exhibit C.

### 1.    The Parties Have Failed to Satisfy their Burden of Isolating and Demonstrating Specific Particularized Harm.

First, the parties have failed to meet the burdens imposed upon them by either the common law or the First Amendment.  As already explained, those burdens require that the parties identify and justify, redaction by redaction, the portions of the Award justifying sealing.  The parties have not met this burden.  To the contrary, they have merely recited, in conclusory and blanket fashion, generalized claims of competitive harm.  *See In re Application of Ewe Gasspeicher* GmbH, 2020 WL 1272612, at *4 ("In addition, generic labels signifying the very existence of the arbitration also do not meet the *Avandia* standard. (*See*, *e.g.*, D.I. 38 at 1 (redacting the words 'Arbitration' and 'Response'); D.I. 44 at 1 (redacting the words 'the Panel's decision.').  Similarly, information summarizing or describing the arbitration's procedural history is not the type of information that courts typically protect. (*See*, *e.g.*, D.I. 66 (redacting 'on July 10, 2019, the German Entities submitted an Application for Change of the Calendar of Proceedings ....').  Finally, portions of briefs, motions, or notices that quote materials filed in the arbitration are not per se entitled to confidentiality (even if the underlying arbitration document should be kept confidential in its entirety) unless a party can show that the quoted material by itself meets the *Avandia* standard. Certain quotes of the arbitration material are simply too benign to warrant a categorical rule.").

To the extent that these harms are grounded in embarrassment or reputational injury to either party, as previously explained, those interests are *per se* disqualified

as sufficient to justify sealing.  *See, e.g., Avandia*, 924 F.3d at 666; *Westinghouse*, 949 F.2d at 663;  *Littlejohn*, 851 F.2d at 685; *Publicker*, 733 F.2d at 1074. "Simply showing that the information would harm the company's reputation is not sufficient to overcome the strong common law presumption in favor of public access to court proceedings and records." *Brown & Williamson*, 710 F.2d at 1180.  ("[T]he natural desire of parties to shield prejudicial information contained in judicial records from competitors and the public . . . cannot be accommodated by courts without seriously undermining the tradition of an open judicial system. Indeed, common sense tells us that the greater the motivation a corporation has to shield its operations, the greater the public's need to know." *Lugosch*, 435 F.3d at 123).

To the extent that there may be specific technical or commercial information that would cause palpable commercial harm to either party, no such harm has been isolated or demonstrated by either party.  Critically, distilled to the core, the parties do not rely on particularized demonstrations of palpable harm that would be caused to either of them by disclosure of the material contained in the Award, but rather rely instead on the confidentiality protocols of the German DIS rules under which the pending DIS arbitration proceedings are being conducted in Germany.

The initial ruling by Judge Andrews denying Storag's opening motion to seal, and the subsequent denial of Storag's motion for reconsideration of that ruling by Judge Connolly, may or may not partake of the *gravitas* or solemnity required to

constitute the formal "law of the case."  The "law of the case" doctrine "'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 816 (1988); *quoting Arizona v. California*, 460 U.S. 605, 618, (1983).  "This rule of practice promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'" *Christianson*, 460 U.S. at 618, *quoting* 1B J. Moore, J. Lucas, & T. Currier, *Moore's Federal Practice* ¶ 0.404[1], p. 118 (1984).  Even so, setting the formalities of the "law of the case" doctrine aside, the explanation articulated by Judge Andrews in denying Storag's initial sealing motion reflected the Court's cogent and considered judgment that the mere existence of German arbitration rules providing for confidentiality do not "provide good cause for sealed proceedings in U.S. Courts." (D.I. 7).

Multiple rationales support this principle, on the specific facts of the record here, and more broadly as applied in the international context of § 1782.[6]  In

---

[6] While not critical to resolution of the issues pending here and not relied upon in this Report and Recommendation, it is worth observing as an aside that the confidentiality recitals in German DIS Article 44.1 do not impose irrevocable obligations of confidentiality.  Rather, Article 44.1 begins with the permissive language: "Unless the parties agree otherwise."  Storag and Baker Hughes could have agreed that that anything necessary to permit this District Court to evaluate their conflicting positions regarding the propriety of discovery under § 1782 could, by mutual agreement, be disclosed to the public.  To the extent that litigation over the § 1782 application may have required some disclosure to the District Court of underlying material implicating trade secrets or other information that would cause

addressing these matters, the Special Master is sensitive to and appreciative of the highly professional and nuanced advocacy of counsel representing both parties. Estimable lawyers representing both parties, from Delaware, across the United States, and Europe, have ably explained the significant cultural differences between the presumptions of openness applicable in American judicial proceedings, and the very different cultural and legal traditions that apply outside the United States, and that are specifically in play in these proceedings conducted pursuant to the default DIS arbitral rules in Germany.   With appreciation for that advocacy and acknowledgment of those cultural and legal differences, however, this Report and Recommendation finds the arguments ultimately unpersuasive.

Elemental principles governing the exercise of federal court jurisdiction strongly militate against the notion that a United States District Court ruling on a § 1782 application should seal filings that would otherwise, applying the access principles derived from the Federal Rules of Civil Procedure, the common law, and

---

specific and palpable commercial harm to either party, such an agreement between Storag and Baker Hughes might have reserved the right to interpose those *specific* assertions justifying sealing.  In short, the German DIS rules by their own terms provided a vehicle through which the parties could have waived any confidentiality provisions contemplated by those rules, perhaps with a carve-out for material that would have permitted motions to seal material consisting of trade secrets or palpably harmful commercial information.  While the parties persistently lament that they are stuck between a rock and hard place—the secrecy obligations imposed by foreign law and the common law and constitutional rights of public access recognized by American courts—perhaps they "doth protest too much." WILLIAM SHAKESPEARE, HAMLET, ACT III, SCENE II.

the Constitution of the United States, be open to the public.

Federal courts apply the federal procedural rules that govern adjudication of matters in federal cases, as derived from the Constitution, federal statutes, the Federal Rules of Civil Procedure, and federal common law.  Applying choice of law principles, federal courts also at times apply the substantive legal rules of decision of states or foreign nations. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).

American federal courts, like their American state court counterparts, however, do not import the *procedural* rules of other American states or foreign courts. "'When, because the plaintiff happens to be a non-resident, such a right is enforceable in a federal as well as in a State court, the forms and mode of enforcing the right may at times, naturally enough, vary because the two judicial systems are not identic.'"  *Hanna v. Plumer*, 380 U.S. 460, 473 (1965), *quoting Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 108 (1945).  "What matters is what the rule itself regulates: If it governs only 'the manner and the means' by which the litigants' rights are 'enforced,' it is valid; if it alters 'the rules of decision by which [the] court will adjudicate [those] rights,' it is not." *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co*., 559 U.S. 393, 407 (2010).

The principles governing the presumption of access to documents filed in federal courts are not in any sense "outcome-determinative" or "substantive" within the meaning of these familiar choice-of-law concepts derived from *Erie* and its

progeny.  They establish no substantive rights or privileges germane to the merits of the parties' underlying dispute, but rather govern the process by which federal courts manage the documents filed before them, and the rules of public access applicable to those documents.  As previously summarized, the principles governing protective orders derive from the Federal Rules of Civil Procedure.   The common law principles derive from the inherent powers of federal courts, as judicial instruments of American sovereignty, to control their own judicial files and records.  "Every court has supervisory power over its own records and files." *Nixon v. Warner Communications,* 435 U.S. at 598.   Courts have "inherent power" to make determinations regarding the confidentiality of matters before them.  *Avandia*, 924 F.3d at 671, *citing Pansy*, 23 F.3d at 786.  The First Amendment principles derive from the United States Constitution.  All three sources of law that govern the sealing of materials in federal court litigation are procedural in nature—though those procedures are animated by commanding presumptions of open access that are powerfully American.  None of those American sources of law should give way to contrary procedures, or contrary values, regarding the conduct of litigation in foreign countries.

"Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." *Intel Corporation*, 542 U.S. at 247. The statute was passed to empower

federal courts to *assist* foreign tribunals.  The statute does not transform federal courts *into* foreign tribunals.   The Delaware Federal District considering an application to assist in discovery on behalf of a party embroiled in an arbitration proceeding in German does not become an arbitral body in Germany; the Delaware Federal District Court remains at all time the Delaware Federal District Court.  As such, the District Court applies its own principles governing public access to documents filed before it.  The Federal Rules of Civil Procedure, the federal common law presumption of access to judicial records, and the First Amendment apply with full force to all documents filed in this Court, undiminished and undiluted by any protocols imposed by private German arbitral forums.

It does not matter that the parties in their underlying commercial contract agreed to arbitrate any disputes arising from the contract in a German arbitral tribunal that imposes (absent agreement of the parties) confidentiality norms profoundly different from those imposed by American federal law.  Arguing to the contrary, Storag points to a single sentence in the Third Circuit's 1984 opinion in *Publicker*, which reads in its entirety: "A similar situation would be presented where there is a binding contractual obligation not to disclose certain information which to the court seems innocuous but newsworthy; in that situation unbridled disclosure of the nature of the controversy would deprive the litigant of his right to enforce a legal obligation." *Publicker*, 733 F.2d at 1073-74. *See Storag Submission* at 4.

What the Third Circuit meant in this somewhat cryptic sentence is not so easy to decipher. To begin, the sentence was dicta. *Publicker* was a seminal opinion of the Third Circuit recognizing both the common law and First Amendment rights of access, and *reversing* a district court's order sealing materials. In a paragraph describing situations in which sealing could conceivably be justified, the Third Circuit postulated three categories: one involving "the content of the information at issue," a second "the relationship of the parties," and the third "the nature of the controversy." *Publicker*, at 733 F.2d at 1073. The Third Circuit then offered examples. For "the content of the information," it used as an example "safeguarding a trade secret." *Id.* For the "relationship of the parties," it posited a suit by a client to prevent a lawyer from disclosing confidential information protected by the attorney-client privilege. *Id.* The Third Circuit then gave as an example of "the nature of the controversy," the sentence at issue, referring to "a binding contractual obligation not to disclose certain information." *Id.* at 1073-74.

What the Third Circuit precisely had in mind in referring to such a "binding obligation not to disclose certain information" as descriptive of the "nature of the controversy" was not further explained in the *Publicker* opinion. Nor does it appear that any subsequent opinion of the Third Circuit, or any district court within the Circuit, has ever relied upon, applied, or interpreted this dicta. Perhaps the court was contemplating contracts such as a non-disclosure agreements, and positing a

dispute over an alleged breach of a non-disclosure agreement as an example of a situation in which "the nature of the controversy" might supply an overriding justification for sealing.  Moreover, whatever the court had in mind, the dicta in *Publicker* did not assert that *all* disclosure of the "nature of the controversy" would be impermissible, but only that "*unbridled* disclosure" would be unwarranted.  *Id.* (emphasis added).

Storag, however, argues that the sentence from *Publicker* has a more sweeping meaning, and under this proffered meaning, attempts to justify all of its sealed submissions filed with this Court. This cannot be the law.  If it were, parties could contract in advance to avoid the entirety of the public access rules otherwise applicable in federal court litigation, asserting as justification for this conversion of the court to a "Star Chamber" their "binding contractual obligation" to litigate in private.

To be fair, Storag does correctly observe that the initial contract between Storag and the German subsidiaries of Baker Hughes contained an arbitration clause, under which arbitration would be conducted pursuant to the rules of the DIS.  Storag in turn makes the fair point that this itself was a "binding obligation."  What Storag seeks to derive from this, however, pushes the argument too far.

The syllogism proffered by Storag is not persuasive.  The underlying contract did include an arbitration clause designating DIS as the arbitral tribunal.  *See* D.I. 5,

Exhibit C, ¶ 9 (reciting the arbitration clause).  And it is true enough that the arbitration clause itself is a "binding contractual obligation."

Yet it stretches credulity to characterize the arbitration clause itself as the sort of "binding contractual obligation not to disclose certain information" the Third Circuit was contemplating in the quoted sentence from *Publicker*.  Nothing in the arbitration clause refers to *any* "information," or to any "obligation of confidentiality."  It is rather a run-of-the-mill plain vanilla arbitration clause designating the DIS as the forum, Hanover Germany as the location, and German as the language of arbitration. See D.I. 5, Exhibit C, ¶ 9.

In the end, Storag's argument proves too much, and amounts to nothing more than another way of asserting that when an application to a federal court for discovery under § 1782 is presented in aid of proceedings in a foreign private arbitration conducted out of public view, all material that is secret in the foreign arbitral proceedings must remain secret in the federal §1782 proceedings as well. After all, effectively *all* enforceable arbitration clauses are "binding contractual obligations."  If Storag's position is sound, it means that federal courts presented with § 1782 applications arising from foreign arbitration proceedings that are being conducted in confidence must follow the confidentiality rules of the foreign arbitral tribunal, not the rules that govern confidentiality under the Federal Rules of Civil Procedure, the common law, and the Constitution of the United States.  Storag's

arguments, and its invocation of the dicta in *Publicker*, are unsound, and must be rejected.  *See In re Application of Ewe Gasspeicher* GmbH, 2020 WL 1272612, at *5  ("Ultimately, the parties have contractually agreed to resolve their differences via an arbitration that keeps confidential 'the existence of the arbitration, the names of the parties, the nature of the claims, the names of any witnesses or experts, any procedural orders or awards, and any evidence.' (D.I. 1 ¶ 4). But the parties have sought assistance with those arbitration proceedings in this Court, which is not bound by the same confidentiality standards.").

For its part, Baker Hughes argues that resolution of the sealing and redaction issues pending before the Court should be driven by application of the *Pansy* factors. Baker Hughes only argues, however, that *Pansy* factors 1, 2, 3, and 7 are germane, and does not address factors 4, 5, 6, or 8.

Addressing the first *Pansy* factor, whether disclosure will violate any privacy interests, Baker Hughes asserts that the sealed material includes competitive information, trade secrets, and technical information regarding its products.

The second *Pansy* factor, whether the information is being sought for a legitimate purpose, Baker Hughes concedes, probably does not apply, since no third party is seeking information.  But to the extent the second *Pansy* factor might apply, Baker Hughes argues, it cuts against disclosure, because Storag is seeking information for an improper purpose.

Under the third *Pansy* factor, whether disclosure will cause embarrassment to a party, Baker Hughes asserts, disclosures could cause harm to it and its subsidiaries, by causing embarrassment and reputational damage, particularly as to information that may be disclosed out of context. *See Baker Hughes Brief* at 15. ("Disclosure of the Arbitration Information could result in loss of good will and reputational harm. If the Arbitration Information becomes public, then the factual and procedural history between the German parties and Storag's unresolved allegations in the pending Arbitration could result in customers of BHGE or BH Germany deciding to use a different supplier, when those customers otherwise would not have been aware of the still-pending and confidential dispute among the parties to the Arbitration.").

Finally, addressing the seventh *Pansy* factor, whether the case involves issues important to the public, Baker Hughes argues that there is no public interest in the details of the private German arbitration proceeding, which is a commercial dispute between the parties, and that the public will be able to discern all it needs to know to understand this Court's resolution of the §1782 application proceeding before it. Baker Hughes thus asserts that "the public has no interest in the status of, submissions made to, and rulings rendered in confidential commercial arbitration proceedings." *Id.* at 16. Furthermore, Baker Hughes argues, "the public will be able to understand these proceedings and the Court's rulings without the need to review

the confidential information at issue. The substance of the Arbitration is entirely ancillary to this Section 1782 proceeding." *Id.*

The arguments advanced by Baker Hughes fail to account for the fundamental divide established in *Avandia* between the *Pansy* standards that govern the issuance of protective orders under Rule 26 and the standards that govern the presumption of access to judicial records under the common law, let alone the even more robust standards that govern access under the First Amendment.

Baker Hughes places significant emphasis on a 2017 Memorandum Order by Judge Burke, in *The Gillette Company v. Dollar Shave Club, Inc*., No. 15-1158-LPS-CJB, D.I. 511, Slip Op. at 4 (D. Del. Sept. 6, 2017).  In that decision, as Baker Hughes correctly observes, Judge Burke did approve redactions regarding the content of certain material relating to arbitration proceedings, including the content of certain determinations made by an arbitral tribunal.  Viewed in its entirety, however, Judge Burke's Memorandum Order in *Gillette* largely cuts against the wholesale redactions urged by Baker Hughes and Storag here.  Judge Burke's Order in *Gillette*, rendered well before the Third Circuit's 2019 guidance in *Avandia*, nonetheless anticipated the core principles that would become the controlling law in the Third Circuit following *Avandia*.  Of particular importance is this passage from Judge Burke's Order in *Gillette*:

> As for these two subcategories of information, it is clear to the Court that there is not good cause for redaction. This is not only because the

parties do not seek redaction of similar information elsewhere in the August 7 Memorandum Order, but, even more importantly, because these categories of information reflect the very crux of the parties' legal dispute. That is, these proposed redactions relate to the key legal questions that led to the Court's August 7 Memorandum Order: did the 2014 Agreement revoke the arbitration provision in the 2008 Agreement, and if not, do the parties' disputes (at issue in the instant litigation) fall within the scope of what should be arbitrated? With information like this redacted, it would be difficult for the public to understand the District Court's decision, because the very issues that were before the Court would be obscured. *See, e.g., Del. Display Grp. LLC v. LG Elecs. Inc.*, 221 F. Supp. 3d 495,497 (D. Del. 2016) (noting that where "[i]nformation ... was relevant to the judicial proceedin [,]" that weighs against the necessity of sealing); *Newman v. Gen. Motors Corp.*, Civil Action No. 02-135 (KSH), 2008 WL 5451019, at *3, *8 (D.N.J. Dec. 31, 2008) (upholding a Magistrate Judge's decision that certain documents should not be sealed, and noting the judge's explanation that the "public has a right to know what evidence and arguments were presented to the Court that led to its decision").

*Gillette*, Slip. Op. at 9.

Judge Burke's opinion also quoted and extensively relied upon a prior opinion

of this Court, *Mosaid Technologies, Inc. v. LSI Corp.*, 878 F. Supp. 2d 503, 513-14

(D. Del. 2012), which in turn approved and relied upon a decision from the United

States District Court for the Southern District of New York, *In re Eastman Kodak

Company's Application,* 2010 WL 2490982, at *1–2 (S.D.N.Y. June 15, 2010).  That

passage from *Mosaid* is also highly salient to the matters pending here:

As the *Kodak* court recognized, civil judicial proceedings cannot effectively operate if huge swaths of judicial opinions and hearing transcripts are subject to redaction. . . . Yet, all the parties here have proposed that the Court redact the discussion of how that case should (or should not) apply to the present facts, because it necessarily reveals some of the terms of the underlying license agreements in this case. In

order for courts to "talk" to litigants and for the public to fully understand a court's precedent, how prior decisions were arrived at, and the similarities among cases, courts need to disclose at least some of the terms of the agreements—even confidential ones—that are the subject of the adjudication. Otherwise, our opinions and transcripts would become useless and devoid of context, such that even the basic nature of disputes would be indiscernible. Indeed, courts have recognized that even terms of highly confidential agreements—such as settlement agreements—may need to be disclosed, such as "when the parties seek interpretative assistance from the court or otherwise move to enforce a provision [of that agreement]."

*Mosaid*, 878 F. Supp. 2d at 512.

As in the observations in *Gillette*, *Mosaid*, and *Kodak*, all of the basic information surrounding the arbitration proceedings in Germany pending here before the Special Master go to the "crux" of the legal dispute pending before the District Court in this §1782 proceeding. Once stripped of any deference to German DIS arbitral rules, the submissions of the parties seeking sealing of the DIS Award cannot meet the standards for ceiling under the common law, as articulated in *Avandia*, let alone the standards applicable under the First Amendment.

In short, the arguments advanced by Baker Hughes for sealing are not persuasive and must be rejected. The *Pansy* factors are not the proper factors to apply. Yet even to the extent that they still provide some residual guidance under the common law or First Amendment analysis, the arguments of Baker Hughes fail, for the reasons previously discussed at length. None of the rudimentary information contained in the filings of the parties, or in the First German DIS Award, qualify for

sealing under either the common law or constitutional standards.  And to the extent that Baker Hughes might plausibly have isolated *particularized* examples of trade secrets or commercially sensitive information *other than* embarrassment or reputational harm, it has failed to meet its burdens of substantive specificity and persuasion.

## 2.    The Material Sought to be Sealed is Already in the Public Domain

There is a second, independent reason for not sealing the material at issue. The materials sought to be sealed have been in the public domain on the docket of this Court for months.  Much of that material has also been revealed on the public docket of the United States District Court for the Southern District of Texas as part of the Texas litigation.

While the parties argued in the hearing conducted before the Special Master that there may be revelations germane to the *second* pending German DIS arbitration that reveal matters separate and distinct from those already in the public domain as a result of the prior release of the *first* DIS arbitral award, the Special Master, having reviewed the record carefully, does not agree.  To the extent that the redacted submissions of the parties reference material germane only to the second DIS proceedings, not the first, none of those redactions involve anything more than the rudimentary "who, what, when, where" materials that this Report and Recommendation has already found inappropriate for sealing.  The Special Master

has not identified, and the parties have not isolated, any unique trade secrets or commercially sensitive information in their filings not already revealed by the already docketed first DIS Award, and now long in the public domain. To conjure Gertrude Stein, "there is no there there."[7]

"Secrecy is fine at the discovery stage, before the material enters the judicial record." *Baxter International*, 297 F.3d at 545, *citing Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984).  But once the cat is out of the bag, it cannot be put back in the bag.  *See SmithKline Beecham Corp. v. Pentech Pharmaceuticals, Inc.*, 261 F. Supp. 2d 1002, 1008 (N.D. Ill. 2003) (Posner, Circuit Judge, sitting by designation) ("but there the cat is out of the bag, so there is no need for the settling parties to submit an amended redacted version.").

After material appears unsealed on a court's docket, and therefore in the public domain, there are little, if any, plausible justifications for subsequently sealing the same material.  *See Gillette*, No. 15-1158-LPS-CJB, D.I. 511, Slip Op. at 4 (noting that some material the parties sought to seal was already unsealed in other submissions). "Once material is in the public domain on the public dockets of courts, there is little sound justification for sealing subsequent filings containing the same public domain material." *Milhouse v. Heath*, No. 1:14-CV-01844, 2016 WL

---

[7] Stein, Gertrude, EVERYBODY'S AUTOBIOGRAPHY 289 (New York: Random House, 1937).

9184416, at *1 (M.D. Pa. Sept. 7, 2016).  "The Court can conceive of no justification to seal an opinion that is readily available in the public domain."  *Sparman v. Edwards*, 325 F. Supp. 3d 317, 319 (E.D.N.Y. 2018).

These principles have particular force in the modern world of electronic filing and judicial dockets openly accessible to the public on government and private databases.  *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2d Cir. 2004) ("But however confidential it may have been beforehand, subsequent to publication it was confidential no longer. It now resides on the highly accessible databases.").  *See also American Civil Liberties Union of Mississippi v. Fordice*, 969 F. Supp. 403, 411 (S.D. Miss. 1994) ("Regarding documents which are in the public domain, if a file contains only material which has already been made public, the Court finds that such files should remain completely open and unredacted."); *aff'd sub nom. American Civil Liberties Union of Mississippi, Inc. v. King*, 84 F.3d 784 (5th Cir. 1996); *Performance Chevrolet, Inc. v. ADP Dealer Services, Inc*., No. 2:14-CV-2738 TLN AC, 2015 WL 13855488, at *1 (E.D. Cal. Feb. 27, 2015) ("Defendant has identified no rule, statute, case or other authority requiring that the document it filed must be sealed or redacted after the fact. To the contrary, the cases addressing this issue have denied requests to seal documents where they were already publicly filed, or where the information contained in the documents is already in the public domain.") *citing Level 3 Communications, LLC v. Limelight Networks, Inc.*, 611 F. Supp. 2d 572

(E.D. Va. 2009); *Joint Equity Committee of Investors of Real Estate Partners, Inc. v. Coldwell Banker Real Estate Corp.*, 2012 WL 234396, at *2 (C.D. Cal. 2012); *Cooke v. Town of Colorado City, Ariz.*, 2013 WL 3155411, at *2 (D. Ariz. 2013); *Apple, Inc. v. Samsung Electronics Co.*, Ltd., 2014 WL 722489, at *1 (N.D. Cal.2014).

Members of the public, and more pointedly, any competitors of either Baker Hughes or Storag keen on mining whatever competitive information might be accessible from the first DIS arbitral award, have now long had unfettered access to it.  No order of a court can un-ring that bell. This is not just a question of "judicial power," but a question of practical technological futility. "We simply do not have the power, even were we of the mind to use it if we had, to make what has thus become public private again." *Gambale v. Deutsche Bank AG*, 377 F.3d at 144.

## V. Conclusion

For the reasons stated above, this Report and Recommendation finds and recommends that the material submitted under seal in this matter should be unsealed. (D.I. 22, 23, 24, 36, 37, and 41).  Sealing is not justified under the common law right of access to judicial records in civil matters.   As an alternative finding and recommendation, sealing is not justified under the right of access emanating from the First Amendment to the United States Constitution.